# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-3172

SALEH CAPRIC, CAMILA CAPRIC,
ALBERT CAPRIC, and ELVIS CAPRIC,

*Petitioners*,

*v.*

JOHN D. ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,[1]

*Respondent.*

Petition for Review of Orders of the Board of Immigration Appeals
Nos. A70 528 882, A70 528 748, A70 528 749, A70 528 750.

ARGUED SEPTEMBER 25, 2003—DECIDED JANUARY 23, 2004

Before CUDAHY, RIPPLE, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* In 1992, Petitioners Saleh Capric, his wife, Camila, and sons, Albert and Elvis, were citizens of Bar, Montenegro, a region in the former Federal Republic of Yugoslavia ("FRY"). Capric's family entered the United States on September 2, 1992, as non-immigrant visitors for pleasure with permission to remain here until March 1, 1993. Capric himself entered this country on September 19, 1992, as a visitor using a passport and visa

---

[1] The Attorney General has been substituted for the Immigration and Naturalization Service.

he later admitted were fraudulent. Capric filed an asylum application in October of 1992, which was eventually denied by the INS on February 15, 1996 ("Application 1"). On that same day, Camila, Albert, and Elvis Capric were placed in deportation proceedings for remaining in the United States beyond their authorized periods of stay. 8 U.S.C. § 1251(a)(1)(C)(I) (Supp. II 1996). In November of 1996, Capric was also placed in deportation proceedings for having procured entry into the United States by fraud or by wilfully misrepresenting a material fact. 8 U.S.C. § 1251(a)(1)(A).

In a hearing on February 25, 1997, before an immigration judge ("IJ"), the Petitioners conceded deportability and Capric renewed his application for asylum, 8 U.S.C. § 1158(a), and withholding of deportation, 8 U.S.C. § 1253(h) (Supp. II 1996). This second asylum application was not actually filed until a hearing on July 18, 1997 ("Application 2"). His wife and sons were included in that application.[2] Two hearings were held on Capric's asylum application,[3] and on June 11, 1999, the IJ issued a decision denying Capric's application for asylum and withholding

---

[2] Capric's wife, Camila, and their two sons, Albert and Elvis, derivatively claimed asylum based on Mr. Capric's claim. Thus, we will refer to the singular Petitioner or Capric to describe all of the Petitioners as well as Mr. Capric individually. Furthermore, the substantive outcome of Capric's claims is determinative for all Petitioners. 8 U.S.C. §§ 1153(d), 1158(b)(3); 8 C.F.R. § 207.7(a).

[3] The first, held on April 29, 1998 ("Hearing 1"), was conducted in English at the suggestion of Capric's counsel, but was suspended by the IJ after it became clear that a Serbo-Croatian or Albanian translator was needed. The second ("Hearing 2") was conducted with an Albanian translator, but neither the record, nor either parties' briefs reveal the exact date of the hearing.

of deportability, finding (1) the evidence provided by Capric lacked credibility; and (2) even if this evidence was assumed to be credible, he failed to prove eligibility for asylum. The IJ also granted the discretionary relief of voluntary departure in lieu of deportation. 8 U.S.C. § 1254(e)(1) (Supp. II 1996). On July 24, 2002, the Board of Immigration Appeals ("BIA") affirmed the results of the IJ's decision without opinion under its streamlining procedure. 8 C.F.R. § 1003.1(a)(7). This petition for review followed. For the following reasons it is denied.

## I. History

### A. Background on the Federal Republic of Yugoslavia

From approximately 1989 to 1992, following the death of then Yugoslav communist leader Josip Broz Tito, Serbians, under the leadership of Slobodan Milosevic, asserted direct rule over all of Yugoslavia, including the formerly autonomous provinces of Kosovo and Vojvodina. Consequently, between 1991 and 1992 Slovenia, Croatia, Bosnia and Herzegovenia, and Macedonia all seceded from Yugoslavia. On April 27, 1992, the remaining republics of Serbia and Montenegro formally joined to form the FRY, led by President Milosevic. Milsosevic and his party, the Serbian Socialist Party, continued to rule the FRY until September 2000, when he was defeated in a federal election (though he did not concede defeat until October).

Although formally unified with Serbia in 1992, the government and people of Montenegro retained a distinct identity. Specifically, Montenegrins were very critical of Milosevic's brutal police and military campaign against ethnic Albanians, many of whom were separatist insurgents. Milosevic's campaign focused in the southern FRY province of Kosovo, located within Serbia, and lasted from approximately late 1997 until June 1999. Interna-

tional response to this ethnic cleansing campaign included NATO bombings of Serbia and the stationing of NATO, Russian, and other peacekeepers in Kosovo. In June of 1999, Kosovo was formally declared a United Nations protectorate.

In 2000, Vojislav Kostunica was elected President of the FRY in the federal election that removed Milosevic from power. Partisan differences between nationalist President Kostunica and Zoran Djinjic, Prime Minister of Serbia and Democratic Party member, followed the election. Finally, in 2002, Serbian and Montenegrin political leaders began negotiations aiming to forge a more relaxed relationship between the two republics. These talks led to the formal creation of a loose federation called Serbia and Montenegro on February 4, 2003, legally replacing the former Federal Republic of Yugoslavia. As of November 2003, Milosevic is on trial for war crimes, genocide, and ethnic cleansing at the Hague. *See* United States Department of State, *Consular Information Sheet: Serbia and Montenegro* (Mar. 20, 2003), *available at* http://travel.state.gov/serbia_montenegro.html; United States Central Intelligence Agency, *The World Factbook: Serbia and Montenegro* (Jan. 1, 2003), *available at* http://www.cia.gov/cia/publications/factbook/geos/yi.html; United States Department of State, *Background Note: Federal Republic of Yugoslavia* (Aug. 2002), *available at* http://www.state.gov/r/pa/ei/bgn/5388.htm.

## B.  An Overview of the Treatment of Ethnic Albanians in Montenegro

At the time of Capric's asylum hearings in 1998, as a result of Serbian-nationalist control of both the government and a heavily armed police force numbering over 100,000, ethnic Albanians were subject to widespread discrimination throughout Yugoslavia. But their treatment

varied significantly from area to area. Specifically, ethnic Albanians were subject to numerous and more serious human rights abuses in Serbia, particularly in the formerly autonomous province of Kosovo. Although human rights abuses existed in Montenegro, they did not generally rise to the level found in Kosovo.

The more significant types of mistreatment suffered by ethnic Albanians primarily at the hands of Milosevic-controlled Serbian police included: political killings (in 1996, there was a total of 14 such killings, 13 of which occurred in Kosovo); arbitrary arrest and detention for periods exceeding three days; interrogations and severe beatings while detained; threats and violence against family members, including the holding of family members as hostages; and the arbitrary and illegal searches of homes, vehicles, shops, and offices, typically for weapons, and during which police would confiscate hard currency.

### C.  Capric's Testimony About His Life in Montenegro

Capric is a forty-three-year-old citizen of the former Federal Republic of Yugoslavia. He was born in Montenegro in 1960 and lived there until coming to the United States in 1992. Capric, his wife whom he married in 1984, and their two sons are Albanian ethnic minorities, as well as Moslems.

Capric began employment with the Yugoslav Customs Service in 1981. He was responsible for railway cargo inspections. His wife, Camila, was also employed by the government. Since 1982, she worked in a post office in Pecurice, Bar, Montenegro, eventually becoming its manager. To facilitate Mrs. Capric's employment in the post office, beginning in 1985, the Yugoslav government allowed the Caprics to reside rent-free in a state-owned apartment unit attached to the post office building.

Beginning in 1989 (coinciding with the death of Tito and the rise of Serbian nationalist control of the FRY), the Caprics began experiencing difficulties. Capric's co-workers, the vast majority of whom were Serbian Orthodox, began to ridicule him because of his religion and ethnicity. This continued until he was fired in 1992. Also in 1989, Capric was called to serve in the Yugoslav military; he refused to appear.

Then in April 1992, the Yugoslav government informed the Caprics that they would have until January 1, 1993 to vacate their apartment because the old post office was being torn down in order to build a new one. Capric was told that if he and his family did not vacate the apartment, he would be placed in jail. The building containing the post office and the Capric apartment was eventually torn down in March or April of 1993, and a new post office was built on that same lot.

In June 1992, uniformed police officers entered the Capric apartment around two or three o'clock in the morning. Capric was taken to a police station in Bar where he was detained for five to seven days, without adequate food or water. While at the Capric residence, the police searched the premises for weapons and money. In addition, the police escorted Mrs. Capric to the post office where they performed a search of those premises as well. However, no weapons were found and no money was confiscated.

Also in 1992, Capric was fired from his job with the Customs Service. It is unclear exactly when in 1992 Capric was fired. Some of Capric's testimony indicates that the police intended his detention at a police station in Bar to result in his firing. He also indicated that he was fired because he refused to serve in the Yugoslav military in 1989. Furthermore, from approximately June until September of 1992, Capric was frequently stopped and questioned by uniformed police.

Capric also stated that he was a member of the Albanian Democratic Party. However, he indicated no specific dates of membership or other affiliation. Capric gave no specific information about participation in party activities. In addition, he stated that he was never detained or questioned about his political affiliations or membership in this opposition party.

Unemployed and facing the prospect of finding a new home, Capric determined that his family would seek a new life in the United States. Just before coming to the U.S. in September 1992, Mrs. Capric quit her job and obtained tourist visas for herself and her two sons. Mr. Capric could not obtain a visa, but instead purchased a passport and visa for $6000 under an assumed name. The Caprics arrived in the United States in September 1992. By November of 1996, Capric, Camila, Albert, and Elvis had all been placed in deportation proceedings. Because the Caprics entered deportation proceedings prior to April 1, 1997, we apply statutory immigration law as it stood prior to passage of the Illegal Immigration and Reform and Immigration Act of 1996. *See Krouchevski v. Ashcroft*, 344 F.3d 670, 671 n.2 (7th Cir. 2003).

## II.  Analysis

The Attorney General has broad discretion to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(b). Refugee is defined as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A). Hence, to qualify for a discretionary grant of asylum, an applicant must establish past persecution or a well-founded fear of future persecution. *See,*

*e.g.*, *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002). Put differently, it is the applicant's burden to show that he or she is a "refugee." *See, e.g.*, *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir. 1995), *cited in Sayaxing v. INS*, 179 F.3d 515, 519 (7th Cir. 1999).

Although the statute does not define "persecution," we have indicated that it "'must rise above mere harassment.'" *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003) (quoting *Roman v. INS*, 233 F.3d 1027, 1034 (7th. Cir. 2000)). It includes "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, [] torture," *Toptchev*, 295 F.3d at 720 (quoting *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002) (quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995)), behavior that threatens the same, *Sayaxing*, 179 F.3d at 519, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe, *id*. However, generalized conditions of hardship which affect entire populations do not rise to the level of persecution. *See, e.g.*, *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996).

Under 8 C.F.R. § 208.13(b)(1), if an applicant proves past persecution, a rebuttable presumption arises that the alien has a well-founded fear of future persecution. *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000). The government can then overcome that presumption if conditions in the country from which the applicant fled have changed to such an extent "that the applicant no longer has a well-founded fear of persecution" if he or she were to return. 8 C.F.R. § 208.13(b)(1)(i)(A). But even if the government demonstrates changed conditions such that the alien need not fear future persecution, asylum still may be granted if the past persecution was sufficiently heinous. *See Bereza v. INS*, 115 F.3d 468, 475 (7th Cir. 1997), *cited in Pop v. INS*, 279 F.3d 457, 461 n.2 (7th Cir. 2002).

Alternately, under 8 C.F.R. § 208.13(b)(2) an applicant can affirmatively demonstrate a well-founded fear of persecution if his fear is subjectively genuine and objectively reasonable in light of credible evidence. *Sayaxing*, 179 F.3d at 519-20 (quoting *Tzankov v. INS*, 107 F.3d 516, 519 (7th Cir. 1997)); *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997). The subjective fear component turns largely upon the applicant's own testimony and credibility. *Sayaxing*, 179 F.3d at 520. But the objective component requires the applicant to prove that either (a) there is a reasonable probability that he or she will be singled out individually for persecution, 8 C.F.R. § 208.13(b)(2)(i); or that (b) there is a pattern or practice of persecution of an identifiable group, to which the alien demonstrates he belongs, such that the alien's fear is reasonable, 8 C.F.R. § 208.13(b)(2)(iii).

Proof of past persecution or a fear of future persecution is established, in part, by the information contained in the asylum application, including the alien's detailed statements about his mistreatment and other evidence, if available (i.e., birth certificates, passports, news articles, photos, hospital records, witnesses' affidavits). However, in nearly every case, the alien will exercise his due process right to present evidence on his behalf by testifying before the IJ about the adversities suffered in his home country. Additional documentary or other evidence may be introduced at the hearing as well.

Because direct authentication or verification of an alien's testimony and/or evidence is typically very difficult and often impossible, the IJ evaluates the credibility of the applicant's evidence. A credibility analysis assesses the applicant's claim only for internal consistency, detail, and plausibility, typically demonstrated by background evidence concerning general country conditions, if available. *See In re S-M-J-*, 21 I. & N. Dec. 722, 724 (BIA 1997), *quoted in Abdulai v. Ashcroft*, 239 F.3d

542, 551 n.6 (3d Cir. 2001). A credibility analysis should not be confused with a burden of proof analysis, which considers and weighs all the surrounding evidence. *Abdulai*, 239 F.3d at 551 n.6. If determined to be credible, the testimony of the alien alone "'may be sufficient to sustain the burden of proof without corroboration.'" [4] *In*

---

[4] Regarding corroboration requirements, the federal regulation is quite general, stating, "[t]he testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (emphasis added). In 1997 the BIA interpreted this regulation in specific terms. *See In re S-M-J-*, 21 I. & N. Dec. 722 (BIA 1997). In *S-M-J-*, the BIA held that corroborating evidence is *not required* where the record contains general country condition information in accord with the asylum claim and where the applicant relies primarily on personal experiences not reasonably subject to verification or impossible to verify. *Id.* However, the BIA also held that corroborating documentary evidence of the applicant's experience *is required,* or an explanation should be given as to why the information was not presented, "where it is reasonable to expect such corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim." *Id*; *see, e.g.*, *In re M-D-*, 21 I. & N. Dec. 1880 (BIA 1998) (stating that it is generally reasonable to expect applicants to produce letters from family members remaining in the applicant's home country). Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984), the BIA's interpretations of the statutes and regulations that it administers are accorded substantial deference.

Both the Second and Third Circuits have approved the BIA's corroboration requirement as set out in *In re S-M-J-* and *In re M-D-*. *See Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir. 2003) (citing *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001)); *Guan Shan Liao v. U.S. Dept. of Justice*, 293 F.3d 61, 71 (2d Cir. 2002) (citing *Diallo v. INS*, 232 F.3d 279, 285 (2d Cir. 2000) (noting *Chevron*, 467 U.S. at 843)). The Ninth Circuit, however,

(continued...)

*re S-M-J-*, 21 I. & N. Dec. at 724 (quoting 8 C.F.R. § 208.13(a)).

However, if the IJ finds the testimony to be incredible, then a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence is required. *See, e.g.*, *de Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997). Without such an explanation or corroboration, whether included with the application, presented at the hearing, or submitted via a motion to reopen the case to supplement the record during the pendency of an appeal to the BIA, the applicant cannot meet his burden of proof and his asylum claim will fail. *See, e.g.*, *Mansour v. INS*, 230 F.3d 902, 906 (7th Cir. 2000) (affirming asylum denial where applicant's testimony was riddled with discrepancies, which the applicant failed to explain except to allege a language difficulty); *Malek v. INS*, 198 F.3d 1016, 1019-21 (7th Cir. 2000) (affirming asylum denial where the applicant's testimony was found to be "vague, [and] lacking in internal consistency and plausibility" and where corroborating testimony was unpersuasive because the witnesses had limited knowledge of the alien's experiences in his home country); *Ahmad v. INS*, 163 F.3d 457, 461-63 (7th Cir. 1999) (affirming asylum denial where applicant's testimony con-

---

[4] (...continued)

disapproved of the requirement and held corroboration unnecessary when testimony of the alien is credible. *Ladha v. INS*, 215 F.3d 889 (9th Cir. 2000), *cited in Abovian v. INS*, 257 F.3d 971, 974 (9th Cir. 2001) (dissenting opinion). Although we have noted the existence of the BIA's corroboration requirement and the Ninth Circuit's disapproval therefor, *Meghani v. INS*, 236 F.3d 843, 846 (7th Cir. 2001), we have not yet either accepted or rejected it. For a detailed discussion of this issue, please see Kurtis A. Kemper, Annotation, *Necessity and Sufficiency of Evidence Corroborating Alien's Testimony to Establish Basis for Asylum or Withholding of Removal*, 179 A.L.R. Fed. 357 (2002).

flicted with his asylum application, where the IJ disbelieved a letter corroborating the applicant's membership in a political party, and where the applicant failed to submit additional corroborative evidence).

## A. Standard of Review

While we review the legal analysis of the immigration courts de novo, *Ciorba*, 323 F.3d at 544, factual findings such as denials of petitions for asylum and withholding of deportation are reviewed for substantial evidence, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). The BIA's decision must be affirmed if it is supported by "'reasonable, substantial, and probative evidence on the record considered as a whole.'" *Elias*, 502 U.S. at 481 (quoting 8 U.S.C. § 1105a(a)(4), *cited in Useinovic v. INS*, 313 F.3d 1025, 1029 (7th Cir. 2002). We will overturn an agency's determination only when "the evidence compels that contrary conclusion," *Ciorba*, 323 F.3d at 544 (quoting *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997)), and not "'simply because [we] would have decided the case differently,'" *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003) (quoting *Yadegar-Sargis v. INS*, 297 F.3d 596, 601 (7th Cir. 2002)). In short, our review is highly deferential. *Georgis*, 328 F.3d at 968; *Toptchev*, 295 F.3d at 720.

An IJ's credibility determinations also enjoy "highly deferential" review, *Mansour*, 230 F.3d at 906, so long as they are supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding," *Ahmad*, 163 F.3d at 461 (quotations omitted). Akin to review of a BIA's denial or grant of asylum and withholding of deportation, an agency's credibility findings should not be superseded simply because an alternate finding could also be supported by substantial evidence. *Id.* (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)). In sum, these findings

of fact should only be overturned under "extraordinary circumstances." *Pop v. INS*, 270 F.3d 527, 531 (7th Cir. 2001); *Ahmad*, 163 F.3d at 462 (listing cases where the IJ's credibility determinations were not supported by substantial evidence); *Nasir v. INS*, 122 F.3d 484, 486 (7th Cir. 1997).

When, as here, a case is streamlined, the IJ's decision becomes that of the BIA for purposes of judicial review. *Georgis*, 328 F.3d at 966-67. And with these principles in mind, we turn to Capric's case. Although difficult to discern from Petitioner's brief, we understand Capric to be making essentially three claims. First, he argues that he was denied due process of law because (a) he testified without an interpreter in his initial immigration hearing on April 29, 1998 ("Hearing 1"); and/or (b) the State Department's Country Profile of Asylum Claims and Country Conditions for Serbia/Montenegro for April 1997 ("Profile")[5] was so unduly prejudicial that after reading the Profile, the IJ was unable to fairly evaluate Capric's claims. Second, Capric argues that the IJ's adverse credibility determination was in error. Third, if we find the evidence provided by Capric to be credible, then he proved he suffered past persecution and a well-founded fear of persecution should be presumed. Alternatively, and again premised upon a finding that Capric is credible, he otherwise affirmatively demonstrated such a fear. We find none of these arguments persuasive.

## B.  The Due Process Claims

Aliens in the United States are entitled to due process. *Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003) (citing

---

[5] The March 1997 Profile was also entered into the record. However, because the Profiles are nearly identical, "Profile" refers either to both Profiles or to the April 1997 Profile.

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Ambati v. Reno*, 233 F.3d 1054, 1061 (7th Cir. 2000). And these rights apply in a deportation proceeding. *Podio v. INS*, 153 F.3d 506, 509 (7th Cir. 1998) (citations omitted). Due process requires that an applicant receive a full and fair hearing which provides a meaningful opportunity to be heard. *Kericku*, 314 F.3d at 917. We review de novo Capric's claims that his due process rights were violated because (a) he testified without an interpreter at Hearing 1; and/or (b) the Profile was unduly prejudicial. *Id.*

An alien is required to raise and exhaust his remedies as to each claim or ground for relief if he is to preserve the right to judicial review of that claim. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 594-95 (3d Cir. 2003); *Mojsilovic v. INS*, 156 F.3d 743, 748 (7th Cir. 1998). Although due process claims generally do not require exhaustion because the BIA does not have authority to review constitutional challenges, when those issues involve procedural errors correctable by the BIA, applicants must raise such claims as part of their administrative appeal. *Sayaxing,* 179 F.3d at 522. To prevail on a due process claim an applicant must show prejudice. *Roman v. INS*, 233 F.3d 1027, 1033 (7th Cir. 2000) (citing *Mojsilovic v. INS*, 156 F.3d 743, 749 (7th Cir. 1998)). Prejudice can be found only when the due process transgression is "'likely to impact the results of the proceedings.'" *Rusu v. INS*, 296 F.3d 316, 320-21 (4th Cir. 2002) (quoting *Jacinto v. INS*, 208 F.3d 725, 728 (9th Cir. 2000)).

### 1. Lack of Interpreter

A due process challenge alleging a failure to be heard meaningfully because no interpreter was provided is

procedural in nature and therefore must be raised before the BIA. *See, e.g.*, *Malek v. INS*, 198 F.3d 1016, 1021-22 (7th Cir. 2000). Respondent alleges Capric failed to exhaust his administrative remedy as to this issue, thereby waiving it here. While Capric stated in his notice of appeal that the "deportation hearing did not comport with the requirem[e]nt of due process," (A.R. 49), there was no explicit elaboration in his subsequent BIA appeal brief, (A.R. 17-26). The appeal brief does contain a cursory mention of the interpreter problem:

> The IJ in his decision about credibility states that the Respondent is fluent in English, this is an overstatement. The Respondent does speak and understand some English but as can be seen in the transcript he is far from fluent. After the Respondent initially attempted to testify in English, the IJ stopped the hearing because he felt an interpreter was needed.

(A.R. 23) (citations omitted). Although Capric's appeal to the BIA did not frame the lack of an interpreter problem explicitly in due process terms, the combination of both his notice of appeal and his later brief were arguably enough to alert the BIA to the issue. *See, e.g.*, *Abdulrahman*, 330 F.3d at 595 n.5. Regardless of whether the issue was properly preserved for appeal, the claim is easily determined to be meritless.

Capric failed to either allege or demonstrate any prejudice resulting from his testimony at Hearing 1. At his attorney's suggestion, Capric did testify in English at Hearing 1. (A.R. 84.) However, it quickly became apparent that Capric needed an interpreter, and the IJ *sua sponte* terminated the hearing. (A.R. 103.) At the second hearing in 1998, an Albanian interpreter was provided. Capric does not argue that any evidence was misunderstood or otherwise obscured because of language difficulties in Hearing 2. Nowhere does he question the capabil-

ity of the interpreter provided in Hearing 2. His basic argument is that the adverse credibility finding was somehow the result of his testimony given in English in Hearing 1.

However, even now Capric does not identify any specific testimony from Hearing 1 that the IJ relied upon in his decision. Instead, when referencing Capric's testimony, the IJ referred exclusively to testimony given in Hearing 2, where Capric was assisted by an interpreter. Furthermore, Hearing 2 provided Capric with a full opportunity to testify on his own behalf and to clarify any points of confusion which he perceived to have resulted from Hearing 1. Hence, Capric has not demonstrated, or even alleged, that he was prejudiced by his attorney's decision to have him testify in English at Hearing 1.[6]

Moreover, due process requires a meaningful *opportunity* to present a claim, but imposes no obligation to ensure that the alien actually makes a meaningful presentation. *Rusu v. INS*, 296 F.3d 316, 324 (4th Cir. 2002). Capric, through counsel, "suggest[ed]" and agreed to testify in English at Hearing 1. (A.R. 84.) Thus, to the extent that Capric's alleged language problems were self-inflicted, we can provide no relief. *Rusu*, 296 F.3d at 324; *but cf. Nazarova v. INS*, 171 F.3d 478, 480-82 (7th Cir. 1999) (vacating a deportation order entered *in absentia* on due process grounds when alien would not take the stand without the interpreter, who was late); *Amadou v.*

---

[6] Capric makes repeated mention of the IJ's statement in his opinion that Capric was "fluent in English." (A.R. 57.) But it is irrelevant with respect to his due process claim. Regardless of whether Capric was fluent in English, the provision of an Albanian interpreter at Hearing 2 ensured that he had a meaningful opportunity to present his claim and to explain any inconsistencies between his two applications and his testimony, as was the IJ's concern.

*INS*, 226 F.3d 724, 728 (6th Cir. 2000) (finding a due process violation where specific and identifiable misinterpretations led to an adverse credibility determination).

### 2. The State Department Profile

A due process challenge alleging unduly prejudicial documentary evidence is also procedural in nature and therefore must be raised before the BIA. As previously quoted, Capric stated in his notice of appeal that the "deportation hearing did not comport with the requirement of due process." (A.R. 49.) But he failed to make any specific or even general allegations regarding the Profile in his subsequent BIA appeal brief, (A.R. 17-26.) This was not enough to alert the BIA to the issue. Indeed, Capric's brief to this court contains the first mention of the allegedly prejudicial nature of the Profile. Had Capric properly brought this argument to the BIA's attention, it could have granted the usual remedy of a new hearing, with a new IJ and/or excluding the Profile entirely or in part. Because Capric did not raise this issue before the BIA, he may not raise it now.

Even if we did have jurisdiction to review this issue, Capric's claim is meritless because he suffered no prejudice as a result of the IJ's decision to admit the Profile into evidence. First, he had a full opportunity to rebut and challenge the opinions expressed in the Profile. *See Gailius v. INS*, 147 F.3d 34, 46 n.7 (1st Cir. 1998). Second, nothing in the transcript of either Hearing 1 or 2 demonstrates that the Profile irreparably colored the IJ's view of ethnic Albanians as a group. Last, the IJ's decision did not refer to any portion of the Profile which could possibly be construed as prejudicial. Even the language

which Petitioner vigorously takes issue with,[7] when viewed in its complete context, cannot be considered unduly prejudicial. Essentially, Petitioner argues that because the IJ "obviously read [the Profile] . . . [he] was [improperly] influenced by it." (Pet. Reply Br. at 26.) This conclusory logic is neither persuasive, nor legally sufficient. Even assuming the Profile is impermissibly inflammatory, which we find it is not, the Petitioner has not suffered any identifiable or even likely prejudice. In short, this argument is an attempt to cloak a substantial evidence challenge to the IJ's decision in due process constitutional garb.

## C. The Credibility Determination

The IJ's adverse credibility determination is supported by substantial evidence and deserves our deference. In his decision, the IJ cited no fewer than seven discrepancies between Capric's original application filed in October of 1992 and completed in his own hand ("Application 1"), (A.R. 194-98), his amended application filed in July of 1997, completed by Capric's attorney and signed by Capric ("Application 2"), (A.R. 154-61), and his testimony at Hearing 2 in 1998 (A.R. 107-32). Also, the IJ noted Capric's failure to explain each of these discrepancies during his testimony at Hearing 2. At least four of the inconsistencies go to the heart of Capric's claim. *de Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997) (reasoning that minor inconsistencies or omissions will not support an adverse credibility finding, but discrep-

---

[7] Capric referred to a particular passage from the Profile that stated "[p]erhaps because of poverty and unemployment, ethnic Albanians from the Balkans are often alleged to be disproportionately involved with drug running, crime, and people smuggling." (A.R. 208.)

ancies involving the "heart of the asylum claim" do (quoting *Ceballos-Castillo v. INS*, 904 F.2d 519, 520 (9th Cir. 1990)); *see Malek*, 198 F.3d at 1020-21 (clear inconsistencies between application and testimony support adverse credibility determination); *Pal v. INS*, 204 F.3d 935, 938 (9th Cir. 2000); *but cf. Chanchavac v. INS*, 207 F.3d 584 (9th Cir. 2000) (reversing adverse credibility determination where inconsistency merely was that alien highlighted certain details in his original application which were omitted in his later application); *Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) (finding that an "applicant's testimony is not *per se* lacking in credibility simply because it includes details that are not set forth in the asylum application").

First, Capric's responses to the question, "Why are you seeking asylum?", were inconsistent. On Application 1 he wrote, "To live in a free country raising my two sons in freedom without being a[]fraid to say who or what they are. I run from war since I consider this an [u]njust and illegal war. A war against minorities and a war against religion. [sic]" (A.R. 195.) On Application 2 Capric indicated that he and his family were "under a fear of persecution . . . stem[ming] from [Capric] being Moslem." (A.R. 253.) Capric also stated he refused to appear for military service, was fired because of his religion and failed to find alternate employment, was arrested and detained for one week, and was forced out of his home. However, in his testimony Capric did not explain why he made no mention of his religion, his job loss, his arrest, or the forcible taking of his home in Application 1.

Second, Capric's responses to the question, "What do you think would happen to you if you returned to the country from which you are claiming persecution?", were inconsistent. On Application 1, he wrote "[t]hey (the Serbs) would persecute me or even put me in jail for leaving the country." (A.R. 195.) On Application 2 he indi-

cated that he and his family would be subject to incarceration or death because they are Moslem and/or because he refused military service. He offered no explanation at Hearing 2 why he failed to mention in his original application that his family's lives might be at risk, a fact the IJ reasoned would not likely be forgotten.

Third, on Application 1 Capric unequivocally indicated that neither he nor his family had ever belonged to or been associated with any organizations or groups in Montenegro. (A.R. 196.) But on Application 2 he indicated that he had been a long-time member of the Albanian Democratic Party and had actually organized many meetings in Montenegro. (A.R. 254.) When confronted with this contradiction during Hearing 2, Capric gave only a cursory explanation of the organization's purpose and did not discuss his alleged efforts to organize meetings nor explain why he failed to mention his membership on Application 1. Furthermore, Capric presented no corroborating evidence of his alleged party membership.

Fourth, and perhaps most disturbing, although it is reasonable to expect particularly invasive events to be mentioned in asylum applications, *Pop*, 270 F.3d at 532, Capric unequivocally indicated on Application 1 that neither he nor any member of his family had ever been arrested, detained, interrogated, or convicted and sentenced. (A.R. 196.) However, in Application 2 Capric indicated that he was (1) "arrested, detained, and imprisoned by government officials" for his refusal to serve in the military; (2) the arrest occurred while he was attending a meeting; (3) he was imprisoned for one week without adequate food or water; and (4) was later stopped by the police on several occasions. (A.R. 254.) Furthermore, at Hearing 2 Capric offered no explanation for the discrepancy between the Applications and testified that he was arrested at his *home* at *two or three o'clock in the morning* and was held by police for *five days*, (A.R. 112-13,

115-17, 119), in conflict with both Application 1 and 2. Neither did Capric offer any explanation regarding his failure to mention in Application 1 the frequent stops and inquiries he endured at the hands of the police.

The IJ also found unbelievable and insufficiently corroborated Capric's allegation that the government demolished his family's apartment as part of an effort to force Albanians and Moslems out of Montenegro. Capric testified that the property and building they resided in were owned by the government. The Caprics resided there either rent-free or at a greatly reduced rate. The Capric's were given at least eight months to relocate. Finally, the old post office building, in which the Caprics apartment was located, was actually torn down and a new post office erected in March or April of 1993. (A.R. 111-15, 117-19, 121-25.) At a minimum, substantial evidence supports the IJ's decision not to credit Capric's uncorroborated belief that he and his family were forced out of their apartment due to their religion or ethnicity, rather than because the government was building a new post office.

Capric makes much of the IJ's conclusion that Capric was "fluent" in English. Admittedly, and as Hearing 1 showed, Capric's proficiency in English was questionable. However, Capric himself indicated on Application 1 that he was "fluent" in English and chose to complete that application in English, without assistance. As Application 1 demonstrates, Capric could read, understand, and thoroughly respond in writing to the questions asked in the application. (A.R. 194-98.) At a minimum, Capric understood English well enough to comprehend and respond "No" to the two critical questions which asked whether he or his family were ever involved with any organizations in Montenegro and whether they had ever been arrested, detained, or interrogated. (A.R. 196.) His testimony at Hearing 1 reveals only a (partial) inability

to communicate orally in English. Regardless, at Hearing 2, assisted by an interpreter, Capric had a meaningful opportunity to explain the noted inconsistencies and to offer otherwise consistent and supporting testimony.

In short, language difficulties can in no way excuse the significant inconsistencies between the applications and testimony given at Hearing 2. Instead, the IJ correctly concluded that the attorney-drafted Application 2 distorted and embellished the hardships faced in Montenegro, and amounted to a "fictionalized account of persecution," which Capric could neither keep straight nor explain at Hearing 2. The discrepancy regarding whether any member of the Capric family had ever been arrested, detained, interrogated, or convicted and sentenced, given its memorability, coupled with the other inconsistencies, and Capric's failure to explain them or offer credible extrinsic corroboration, provides substantial evidence to support the IJ's credibility finding. We find that this is not the extraordinary circumstance which would demand reversal of the IJ's adverse credibility determination.

### D.  Asylum Eligibility

Although we need not consider whether if what Capric alleges, when assumed to be credible and true, would rise to the level of persecution or demonstrate a well-founded fear of persecution, substantial evidence supports the IJ's conclusion that it does not. There is no doubt as to the hardships ethnic Albanians faced in the former FRY, but "political turmoil alone does not permit the judiciary to stretch the definition of 'refugee' to cover sympathetic, yet statutorily ineligible asylum applicants." *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir. 1992). The evidence in this case does not compel a conclusion that Capric was either persecuted in the past or has a well-founded fear of future persecution.

## 1.  Past Persecution

First, Capric alleges that he may have been arrested and/or lost his job as a result of his refusal to serve in the military in 1989. Refusal to serve in the military, particularly if based upon religious objections, may be viewed as a political act. *See, e.g.*, *Begzatowski v. INS*, 278 F.3d 665, 667-70 (7th Cir. 2002). However, he was not arrested and detained until 1992. Similarly, he did not lose his government job until 1992. The very government which had attempted to compel his military service had formally broken apart in 1990, and had been replaced with the FRY in 1992. Thus, the evidence does not lead to the conclusion that he was arrested or fired *on account of* his refusal to serve in the military two to three years earlier.

Also, even if his arrest and detention were the result of his refusal to serve, such events would not necessarily amount to "persecution." The law of the FRY permits the police to hold suspects for up to 72 hours, or three days. (A.R. 146.) Assuming that Capric was held for a week without adequate food or water, he did not testify that he was interrogated or physically brutalized while detained. In fact, although in Application 2 Capric alleged he was stopped frequently by police from June until September of 1992, he was never arrested again, nor ever interrogated. In *Borca v. INS*, 77 F.3d 210, 215 (7th Cir. 1996), we affirmed a BIA finding that an alien had not been persecuted and held that two arrests, two home searches, and numerous threatening phone calls on account of the alien's political activities merely amounted to harassment. Likewise, in *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990), we upheld the BIA's finding of no persecution where the alien had been arrested, detained, and had his home searched many times over a four-year period. Capric's mistreatment does not even rise to the level of harms suffered in either *Borca* or *Zalega* and

hence, does not compel the conclusion that he was persecuted.

Second, as discussed in detail above, there is nothing in the record that shows that the Caprics were forced from their apartment *on account of* their religion or ethnicity. Rather, the FRY government asserted its control over a building it owned and in which it allowed the Capric's to reside, virtually for free.

Third, the evidence does not support a finding that Capric suffered economic persecution. We do acknowledge extreme economic hardship as a form of persecution and independent ground for asylum. *Kovac v. INS*, 407 F.2d 102, 105-107 (9th Cir. 1969) (asylum may be granted if there is a probability of deliberate imposition of substantial economic disadvantage due to race, religion, or political opinion), *cited in Borca v. INS*, 77 F.3d 210, 216 (7th Cir. 1996). Assuming, *arguendo*, that Capric was fired because of either his religion and ethnicity or his refusal to serve in the military (assumptions for which there is no evidence except for Capric's testimony), the IJ was nonetheless justified in concluding that there was not substantial evidence demonstrating the probable imposition of a significant economic disadvantage. Simply put, considering the overall circumstances of the Capric family, Mr. Capric's termination from one job is not a sufficiently severe economic hardship. *See, e.g.*, *Khourassany v. INS*, 208 F.3d 1096, 1100-01 (9th Cir. 2000); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990). Even when considered together with the loss of the Caprics' apartment, given that the government gave the family eight months to find a new residence, Mrs. Capric's continued employment with the post office, the total absence in the record of any evidence about even one single attempt on the part of Capric to find any other work, and the harsh *generalized* economic conditions in the FRY at the time, this evidence does not demonstrate

economic persecution. Generalized economic disadvantages and conditions facing entire populations are not persecution.

In sum, Capric may have been harassed and may have suffered economic hardships. But harassment and hardship are not the same as persecution. Even when analyzed in the aggregate, *see Baballah v. Ashcroft*, 335 F.3d 981, 989 (9th Cir. 2003) (cumulatively considering the harms suffered by an alien), these events do not compel the conclusion that Capric suffered past persecution on account of his race, religion, ethnicity, or political beliefs. *See, e.g.*, *Bradvica*, 128 F.3d at 1012-14 (affirming asylum denial of the BIA which held that a Croatian alien from the Bosnia-Herzegovenia region of the FRY did not suffer persecution when he was arrested, detained, interrogated, and physically threatened, where generalized conditions of unrest and strife persisted in the FRY, and where alien alleged that he might be punished for deserting the FRY military). Hence, even if we had overruled the IJ's credibility determination, given the generous standard of review applicable to administrative decisions, we would nonetheless affirm the IJ's finding that Capric was not persecuted. And consequently, he is not entitled to the 8 C.F.R. § 208.13(b)(1) presumption that he has a well-founded fear of future persecution.

### 2. Well-Founded Fear of Future Persecution

Capric's alternate assertion, that apart from any presumption, substantial evidence compels the conclusion that he has affirmatively demonstrated a well-founded fear of future persecution under 8 C.F.R. § 208.13(b)(2), also fails. Such a showing requires that Capric's fear is subjectively genuine and objectively reasonable. We need not consider these arguments at all because Capric's testimony is not credible and thus, he cannot establish a

subjectively genuine fear of persecution. Moreover, even if Capric's entire testimony was credible and he demonstrated a subjective fear of future persecution, he still would not be afforded asylum.

### a.  8 C.F.R. § 208.13(b)(2)(i)

Under 8 C.F.R. § 208.13(b)(2)(i), notwithstanding a subjective fear of persecution, Capric must still prove that he is likely to be singled out for persecution (the objective requirement). *See Elias-Zacarias*, 502 U.S. at 482 ("the mere existence of a generalized 'political' motive underlying [persecution] is inadequate to establish . . . the proposition that [the alien] fears persecution *on account* of that motive"); *Tamas-Mercea v. Reno*, 222 F.3d 417, 427 (7th Cir. 2000) (citing *Bradvica*, 128 F.3d at 1013 ("generalized conditions of strife do not support a claim for asylum because they do not show that [the alien] himself will be singled out for persecution.")); *Sayaxing*, 179 F.3d at 520 (citing *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir. 1992) (applicant must present "specific [and] detailed" evidence that his encounters with the government were of "such a magnitude and frequency that they would cause a reasonable person to fear being singled out for persecution and to demonstrate that his fear of persecution pertained to him individually, rather than to the population generally.") (citation omitted)); *Gonzalez v. INS*, 77 F.3d 1015, 1021 (7th Cir. 1996) ("[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum.") (citing *Sivaainkaran*, 972 F.2d at 165). As discussed *supra* in Part D.1., most of what Capric alleged does not rise to the level of persecution, in the past or future.

Furthermore, Capric specifically identified only two fears of future persecution as such: (a) persecution due to his

failure to serve in the military; and (b) economic persecution. Yet, the FRY undertook only sporadic "efforts to find and/or punish [draft] evaders," and was generally unenthusiastic about arming ethnic minorities. (A.R. 207.) It is also notable that the FRY, as early as June of 1996, "approved amnesty for those who had avoided or deserted from military service between 1991 and 1995." *Id.* Thus, evidence does not compel a finding of a well-founded fear of persecution due to his refusal to serve in the military.

Also, fears of generalized economic hardship or lack of opportunity do not establish a well-founded fear of persecution. *See, e.g.*, *Feleke v. INS*, 118 F.3d 594, 598 (8th Cir. 1997); *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992). Although Capric need not have demonstrated that he was locked out of every possible job, *Borca*, 77 F.3d at 216, he did have the burden of proving that a future significant economic disadvantage was (a) likely; and (b) deliberately directed at him due to his religion and/or ethnicity. This Capric simply did not prove. *See supra* Part D.1.

### b.  8 C.F.R. § 208.13(b)(iii)

Capric also asserts for the first time on appeal that as an ethnic Albanian living in Montenegro and a practicing Moslem, he *per se* has a well-founded fear of persecution should he return to Yugoslavia. In order for Capric's *per se* argument to succeed, even if he demonstrated a subjective fear of persecution, he must still prove that "there is a pattern and practice of persecution of an identifiable group, to which he belongs, such that his fear is reasonable" (the objective requirement). 8 C.F.R. § 208.13(b)(2)(iii); *see Hoxha v. Ashcroft*, 319 F.3d 1179, 1183 n.6 (9th Cir. 2003); *but cf. Ahmad v. INS*, 163 F.3d 457, 463 (7th Cir. 1999) (expressly rejecting a *per se* rule).

The Petitioner's reliance upon the Ninth Circuit case of *Hoxha* is misplaced. First, *Hoxha* addressed the persecution of ethnic Albanians located in *Serbia*, specifically Kosovo. 319 F.3d at 1182-83. Capric is an ethnic Albanian from *Montenegro.* Here again we note that the record explicitly stated that Albanians in *Montenegro* and Sandzak enjoyed better treatment than those located in other areas, such as *Serbia*, particularly Kosovo. Because the alleged "pattern and practice of persecution" was not uniform throughout the FRY, this distinction is key.

Second, the *Hoxha* court never reached the question of whether a pattern and practice of persecution had been shown by the alien. Instead, unlike the instant case, the *Hoxha* court held that the alien had produced evidence compelling a finding of a well-founded fear of future persecution. *Id.* at 1183 n.6. Here there was little evidence of a "pattern and practice" of persecution of ethnic Albanians in *Montenegro.* Capric relied entirely upon State Department reports addressing the FRY generally and detailing ethnic cleansing campaigns in *other* regions.

In sum, evidence does not show that this was an "extreme situation" in which ethnic Albanians were subject to a pattern and practice of persecution in Montenegro. *Compare Kotasz*, 31 F.3d at 852-53 (discussing generally pattern and practice cases and making note of the large-scale systemic attempt by the Nazis to exterminate the Jews). And as we noted in *Bradvica*, if we accepted Capric's argument, proffered for the first time to this court, then nearly all of the population of Serbia, Bosnia-Herzegovenia, and other war-torn areas would be eligible for asylum in the United States. 128 F.3d at 1013.

## E.  Withholding of Deportation

In order to obtain the related, but distinct, relief of withholding of deportation under 8 U.S.C. § 1253(h), the

applicant must demonstrate a clear probability of persecution upon deportation because of race, religion, nationality, membership in a particular social group, or political opinion—a much more demanding burden. *See INS v. Stevic*, 467 U.S. 407 (1984). An alien therefore must show "that it is more likely than not that he or she will be subjected to persecution upon deportation." *INS v. Cardoza-Fonesca*, 480 U.S. 421, 430 (1987); *Toptchev*, 295 F.3d at 720. Hence, if an applicant's asylum claim fails, his withholding of deportation claim will also necessarily fail. 295 F.3d at 720 (citing *Iliev v. INS*, 127 F.3d 638, 641 (7th Cir. 1997)). Because Capric's appeal of his asylum denial fails, his appeal regarding withholding of deportation also fails.

### III.  Conclusion

For the foregoing reasons, Capric's petition for review is DENIED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*