**Ermal HYSAJ, Petitioner,**

v.

**John ASHCROFT, Respondent.**

No. 03–1924.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 2004.

Decided May 7, 2004.

---

Harry E. Ashton, IV, Oak Park, IL, for Petitioner.

George P. Katsivalis, Chicago, IL, William C. Peachey, Washington, DC, for Respondent.

Before COFFEY, MANION, and KANNE, Circuit Judges.

## ORDER

Albanian citizen Ermal Hysaj entered the United States without inspection in December 1998 and six weeks later applied for asylum. The INS subsequently charged him with removability, which Hysaj conceded. Although the Immigration Judge found Hysaj's testimony and corroborating evidence credible, the IJ ultimately held that Hysaj was not eligible for asylum or withholding of removal. The Board of Immigration Appeals affirmed without opinion. We now deny Hysaj's petition for review of the Board's decision.

The facts of this case come from Hysaj's testimony, which the IJ found credible and uncontradicted. Hysaj participated in Albania's 1997 parliamentary elections as a district election official in his home city of Durres. The 1997 elections were marred country-wide by corruption, voter intimidation, and violence. In one extreme case of open violence, an election official appointed by the Socialist Party was killed at a polling place during a run-off election. International election observers credited the majority of fraud and violence to both the ruling Democratic Party and the rising Socialist Party.

Hysaj was not politically active before the 1997 elections. Because he was not aligned with the Democratic Party, which dominated local politics in Durres, representatives of the Socialist Party asked Hysaj to act as vice chairman of District 38's election commission. There were numerous candidates running in District 38's

parliamentary election, but the favored candidate was Democrat Luan Malltezi. Malltezi was married to the daughter of Democratic Party leader Sali Berisha, who served as Albania's president from 1992 until he was replaced in the 1997 elections.

On election day, Hysaj was awaiting votes at the election headquarters in Durres when he was approached in the hallway by two strangers. These men "ordered" him to refuse to certify results from any zone in which Malltezi lost. They spoke with northern Albanian accents, and because of their accents and their message, Hysaj assumed they were representatives of Berisha, whose base and political stronghold is in northern Albania. Despite the warnings, Hysaj certified the election results, which did not give any candidate a majority of votes. Because there was no clear winner, a run-off election between the top two vote takers— Malltezi and the Socialist candidate, Natasha Paco—was scheduled to take place a week later.

The day after the general election, Hysaj was approached in the town square, this time by three different men with northern Albanian accents. The men pushed Hysaj and told him that he should not have signed the results the day before because the Democratic candidate had not conclusively won. The men then told Hysaj that if he certified a Socialist victory in the run-off election, they would kill him. Despite his nervousness about the warnings, Hysaj certified the vote totals that made Socialist candidate Paco the winner. Socialists also won in a majority of other districts, and the Socialists replaced the Democrats as the ruling party in Albania.

Two days after the run-off elections, Hysaj was at work when a group of men with northern accents came to his neighborhood asking for him. Fearing that these men were planning to kill him, Hysaj did not return home and instead went into hiding at a relative's house in Tirana, the capital of Albania. While in hiding, apparently with the help of the newly elected Paco and the Albanian minister of defense, Hysaj secretly arranged to go to a military academy in Italy as part of a ministry of defense scholarship program. Hysaj began the program in Italy in the fall of 1997. After a few months in the academy, Hysaj developed severe ulcers and was sent home to Durres. He returned to his home because he had nowhere else to recover, but told only his immediate family that he was coming home, did not leave his house for the month that he was there, and returned back to school in secret.

In April 1998, Hysaj left school and returned home a second time for a week-long vacation. He believed that he would be in less danger because more time had passed since the elections. He did not encounter any trouble while he was home, but two weeks after returning to Italy he received a call from someone with a northern Albanian accent who told him, "We know where you are now ... and we're going to find you." According to the caller identification on Hysaj's phone, the call had been made from a payphone in Italy. Two weeks after that call, a worker at the local McDonald's, who was also Albanian, told Hysaj that an Albanian man had recently come into the restaurant and asked the worker if he knew anyone at the military academy named Ermal. Fearing that he was still a target of the Democratic Party, Hysaj did not leave the enclosed school campus for the rest of the academic year. At the end of the semester, he fled to Milan and worked under an assumed identity until he had earned enough money to pay a smuggler to take him to the United States by way of Mexico.

After reviewing the record, the IJ concluded that Hysaj's "experiences both during and in the aftermath of the June, 1997 elections [did] not reveal a level of mis-

treatment that is tantamount to 'persecution.' " The IJ went on to hold that Hysaj's past encounters with the government were not of such a "magnitude or frequency" as to create a reasonable fear of future persecution. Because the BIA adopted the IJ's ruling, *see* 8 C.F.R. § 1003.1(a)(7), we review the IJ's decision, reversing only if the ruling lacks substantial evidence to support the IJ's factual conclusions. *See Krouchevski v. Ashcroft,* 344 F.3d 670, 673 (7th Cir.2003). We will overturn an IJ's finding of no persecution only if specific evidence in the record compels a finding of persecution. *Dandan v. Ashcroft,* 339 F.3d 567, 573–74 (7th Cir.2003).

The Attorney General has discretion to grant asylum to any alien who qualifies as a "refugee." 8 U.S.C. § 1158(b). A refugee is an alien "who is unable or unwilling" to return to his home country "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If an applicant proves that he was persecuted by his government in the past, a rebuttable presumption arises that he has a well-founded fear of future persecution. *Capric v. Ashcroft,* 355 F.3d 1075, 1084 (7th Cir.2004). The burden of proof then shifts to the government to overcome that presumption by showing that the applicant's fear is no longer well-founded. *Id.* An applicant can alternatively qualify as a refugee, regardless of a showing of past persecution, if he can demonstrate that he has a subjectively genuine and objectively reasonable well-founded fear of future persecution. *Id.* at 1084–85. To show that his fear is objectively reasonable, an applicant must demonstrate that there is a reasonable probability that he will be singled out individually or that the government has a pattern of persecution against an identifiable group to which he belongs. *See* 8 C.F.R. § 208.13(b)(2)(i), (iii).

On appeal, Hysaj first argues that the IJ should have found that his testimony established past persecution. In support of his argument, Hysaj contends that a death threat always establishes past persecution. But we have advised petitioners that "[i]n the vast majority of cases … mere threats will not, in and of themselves, compel a finding of past persecution." *Boykov v. INS,* 109 F.3d 413, 416 (7th Cir.1997) (threats did not amount to persecution because applicant remained in home country unharmed); *see also Tzankov v. INS,* 107 F.3d 516, 520 (7th Cir.1997) (general threats of violence did not establish persecution); *Borca v. INS,* 77 F.3d 210, 215 (7th Cir.1996) (applicant's experience of "being interrogated twice, having her dwelling searched twice, and receiving threatening phone calls" was "not sufficiently serious to rise beyond the level of harassment."). Only "threats of a most immediate and menacing nature might, in some circumstances, constitute past persecution." *Boykov,* 109 F.3d at 416; *cf. Bace v. Ashcroft,* 325 F.3d 1133, 1141 (7th Cir.2003) (death threats against Albanian election official constituted past persecution when perpetrators also beat official and raped his wife).

The issue here, then, is whether the two verbal threats against Hysaj were so immediate and menacing that they would compel a finding of past persecution. Hysaj presented no specific evidence that either of the threats against him would have been carried out. He suffered no mistreatment when he openly returned to Albania for a week in April 1998. Although he did receive a threatening phone call after he returned to Italy, Hysaj made no attempt at that point to secure protection from the government, which was now led by the party he had represented as an election official. In light of the lack of conclusive evidence to compel a finding

that Hysaj was in real danger, the IJ's finding of no past persecution should not be overturned. *See Dandan,* 339 F.3d at 573–74.

■ Hysaj next argues that even if the IJ correctly found that he had not suffered past persecution, the IJ should have alternatively found a well-founded fear of future persecution. Because the IJ found that Hysaj established that he genuinely feared returning to Albania, the only issue presented on appeal is whether Hysaj showed that there is a reasonable probability that he will be singled out for persecution if he returns to Albania. *See Capric,* 355 F.3d at 1085.

Hysaj's claim of a likelihood of future persecution is based on the same premise as his claim of past persecution–that because of his participation in the 1997 elections his life is in danger. In support of his claim, Hysaj relies on his expert, Professor Nicholas Pano, who testified that if Hysaj returned to Albania, he might still be a political target. Pano testified that both the Democrats and the Socialists continued to harass and intimidate members of each other's parties at the top and local levels. At the same time, Pano conceded that the local police forces and politicians are no longer exclusively controlled by the Democratic Party as they were during the 1997 elections. Pano's views about the political climate in Albania may also carry less weight now because he made his observations three years ago, when Albania was in the midst of a heated 2001 parliamentary campaign. Because the threats made to Hysaj were not "immediate or menacing" enough to sustain a finding of past persecution, then it is even less likely that with the passage of time they will support a finding of probable future persecution. *See Useinovic v. INS,* 313 F.3d 1025, 1032 (7th Cir.2002).

Additionally, since Hysaj left Albania, his father was hired as an officer in the Central National Information Department, which Hysaj describes as comparable to the FBI. His father's position in the government further supports a finding that Hysaj would not face persecution upon return. *See Toptchev v. INS,* 295 F.3d 714, 722 (7th Cir.2002) ("The fact that the petitioners' family members continue to live unmolested in their native country supports the conclusion that the petitioners lack a well-founded fear of persecution."). Accordingly, we will not disturb the IJ's finding that Hysaj lacks an objectively reasonable fear of returning to Albania.

Hysaj's remaining arguments are without merit. The petition for review is accordingly DENIED.