In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3567 & 04-2148

FRED SSALI,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,[1]
United States Attorney General,

*Respondent.*

———————

Petitions for Review of Orders
of the Board of Immigration Appeals.
No. A79-274-867

———————

ARGUED MAY 4, 2005—DECIDED SEPTEMBER 14, 2005

———————

Before RIPPLE, ROVNER and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Fred Ssali is a native and citizen of
Uganda. He entered the United States in May 2000 as a non-
immigrant visitor and remained beyond the time authorized
by his visa. After the Immigration and Naturalization

_____

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
we have substituted the current Attorney General of the United
States, Alberto R. Gonzales, for his predecessor as the named
respondent.

Service ("INS") brought removal proceedings against him, Mr. Ssali applied for asylum. An immigration judge (the "IJ") denied his application, and the Board of Immigration Appeals (the "BIA" or the "Board") affirmed. Mr. Ssali sought review in this court and filed a motion to reopen with the BIA. The BIA denied this motion to reopen, and he separately petitioned for review of that denial. For the reasons set forth in the following opinion, we grant his first petition for review, reverse the judgment of the BIA and remand for further proceedings.

# I

# BACKGROUND

## A. Mr. Ssali's Asylum Application

Mr. Ssali prepared his own asylum application without the assistance of counsel. In the application, he stated that he had been tortured and detained without trial by Ugandan soldiers and that he feared "torture and persecution" if returned to Uganda. A.R.358.[2] On the application, Mr. Ssali checked boxes that identified his membership in a particular social group and his political opinion as the reason for the alleged mistreatment. He further explained that he "strongly oppose[d] and criticize[d] the one party system dictatorship in Uganda, and the banning of multi-party democracy." A.R.360. Thus, he stated, he feared "being subjected to torture . . . and suffering because of baseless false accusations that I am a collaborator with ant[i]-govern-

---

[2] There are two copies of the administrative record before this court. For ease of reference, we refer only to the record in No. 04-2148, filed on October 15, 2004.

ment personnel." *Id.* He also claimed to be "opposed [to] human rights violation in Uganda." *Id*. Mr. Ssali identified himself as a member of the group Human Rights Africa, which he described as a human rights group, and that his "brother (Ben Jjuko) was a member of Uganda Freedom Movement (U.F.M.)[,] a guerilla military group." A.R.359. He also claimed that his "brother was tortured and detained without trial." A.R.358.

**B.  Hearing Before the IJ**

Mr. Ssali appeared at a hearing before the IJ on May 14, 2002. He testified that he had left Uganda out of fear for his life; he stated that "government . . . soldiers wanted to kill [him] . . . [b]ecause [he] was politically inclined" and "did not believe in the . . . dictatorship at the time." A.R.153. Two major events formed the basis for this fear. First, Mr. Ssali described an incident that had taken place in May 1999. Government security officers entered Mr. Ssali's university dormitory room, blindfolded him and drove him to a small army camp. There, he was beaten, kicked and forced to kneel for extended periods of time. He also was questioned about recent bombings and about the group Allied Democratic Front ("ADF") (a group to which, he testified, he had never belonged). His captors told Mr. Ssali that they believed he had information about the bombings because two university students with whom Mr. Ssali was friendly were suspected of being ADF activists. Mr. Ssali was returned to his dormitory room late at night on the same day. Mr. Ssali testified that he reported the incident to university police, who did not take any action, and that a hospital treated him for injuries. He testified that he still has scars on his knees from the incident.

Second, Mr. Ssali testified about events that occurred in December 1999. A bus on which he was traveling was stopped at an army roadblock, and Mr. Ssali was detained. He testified that, although he told the soldiers that he was traveling to western Uganda to conduct research for an academic paper, the soldiers thought that he was traveling to help the ADF. He testified that the soldiers asked him his tribal origin. Mr. Ssali replied that he was Muganda, a member of a tribe to which the parties refer as Baganda or Buganda, which is located in southern Uganda. Upon hearing that Mr. Ssali was Muganda, the soldiers became angry. Mr. Ssali testified that the soldiers told him that "these Buganda . . . are the people who are making our, our political thing fail." A.R.173. Mr. Ssali testified that most Baganda are members of the Democratic Party.

Mr. Ssali then was blindfolded and driven two hours to a camp where he was beaten in order to elicit information about the ADF. The same night, he was driven away from the camp and, when the vehicle in which he was being carried stopped with a flat tire, Mr. Ssali escaped from the truck and hitch-hiked to his father's town, where he was treated for his wounds.

Mr. Ssali stated that he was a member of the Democratic Party in Uganda and that his father, who also was a member of the Democratic Party, had been active in politics in the 1980s. He testified that, after his departure in 1999, someone had approached his father to ask his (Mr. Ssali's) whereabouts. Mr. Ssali also testified about the process of obtaining his visa and passport.

At the outset of Mr. Ssali's testimony, he stated that he did not have any siblings. However, on cross-examination, he stated that he had two sisters and one brother and that his brother's name was Andrew Edward Kafeero. He also

stated that he had an uncle who was killed in 1998 and that his uncle's name was Ben Jjuko.

## C. The IJ's Decision

The IJ's oral decision denied Mr. Ssali's motion for asylum.[3] The IJ determined that the two incidents of beatings that Mr. Ssali had described constituted mistreatment which rose to the level of persecution. The IJ also found support in the record for the notion that Uganda's government continues to commit human rights abuses. Nonetheless, the IJ concluded that, based on several considerations, Mr. Ssali's claim for asylum was not persuasive.

The IJ found that "significant omissions or discrepancies" had surfaced with respect to Mr. Ssali's application for asylum and his testimony at the hearing, and further noted that these irregularities had not been resolved at the hearing. A.R.132. For instance, Mr. Ssali had noted on his asylum application that he was a member of Human Rights Africa, but he had not mentioned that fact at the hearing.

The IJ was puzzled by the fact that several significant aspects of Mr. Ssali's claim had not been brought out in his asylum application or in his direct testimony at the hearing,

---

[3]  The IJ also held that Mr. Ssali's failure to demonstrate a well-founded fear of persecution meant that he could not meet the more demanding standard required for withholding of removal under 8 U.S.C. § 1231(b)(3) or under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, 8 C.F.R. § 208.13(c)(1). Mr. Ssali does not challenge this determination on appeal; therefore, we shall confine our review to his asylum claim.

but rather had surfaced during the Government's cross-examination of Mr. Ssali. For instance, although Mr. Ssali had noted on his asylum application that he had a brother named Ben Jjuko who had been detained and tortured by Ugandan soldiers, he did not mention these facts during his direct testimony. Instead, he had testified during cross-examination that he had an uncle named Ben Jjuko who had been killed in 1998. As well, Mr. Ssali had not included his membership in the Democratic Party in his asylum application or his direct testimony but had only mentioned it on cross-examination.

The IJ also noted that the fact that Mr. Ssali had been able to obtain a Ugandan passport and an exit visa was inconsistent with Mr. Ssali's theory that government officials wished him harm. It surmised that perhaps Mr. Ssali had encountered only regional prejudice, rather than hostility that could be attributed to the national government. Finally, the IJ found it significant that Mr. Ssali had not documented "any specific aspects of his claim" by presenting corroborating evidence. A.R.134.

### D. Appeal to the BIA

The BIA dismissed Mr. Ssali's appeal. In its written decision, the BIA deferred to the IJ's adverse credibility finding in light of "evidence . . . that [Mr. Ssali] significantly embellished his asylum claim by the time of the hearing to the point that we are unable to ascertain what is truthful." A.R.82.

The Board agreed with the IJ as to the existence of

"material discrepancies" in Mr. Ssali's account which went
"to the heart of the . . . asylum claim." A.R.80. For instance,
the BIA reasoned that Mr. Ssali's conflicting testimony
regarding whether Ben Jjuko was his uncle or his brother
cast doubt upon Mr. Ssali's credibility. According to the
BIA, Mr. Ssali's failure to mention his brother's detention
and torture during his hearing testimony further weakened
his credibility because Mr. Ssali's asylum application
had "center[ed]" on the torture and detention he and
his brother underwent. *Id.* The Board found it hard to
believe that Mr. Ssali had failed to mention the "crucial fact"
of his Democratic Party membership in his asylum applica-
tion, in light of the fact that, at the hearing, he attributed his
second detention to his Democratic ties. A.R.81. It consid-
ered suspect the fact that Mr. Ssali had not described the
details of his two detentions in his asylum application.

The Board did, however, regard Mr. Ssali's failure to
testify regarding his membership in Human Rights Africa
as a "minor omission tangential to his asylum claim."
A.R.80. The Board also stated that the IJ should not have
regarded Mr. Ssali's credibility as undermined by his ability
to obtain a passport.

With respect to Mr. Ssali's asylum claim itself, the BIA
noted that his accounts of the two incidents in which he was
detained by government soldiers were "not implausible" in
light of background information on Ugandan politics and
the Ugandan military. A.R.81. The Board also stated, "[T]he
Democratic Party . . . has been historically made up of
southerners and Catholics. While the respondent is from
eastern Uganda, he is a Christian." *Id.*

Although Mr. Ssali's allegations generally were consistent
with conditions in Uganda, the BIA was not persuaded by

his account due to the fact that his asylum claim as presented to the IJ "differ[ed] significantly from the one that he put forth in the asylum application." A.R.82. The BIA rejected Mr. Ssali's contention that the discrepancies could be attributed to his poor command of English; it stated that, as "a well-educated person from a former British colony educated in English," Mr. Ssali was "obviously fluent" in English. *Id.* Indeed, the IJ found it "inconceivable" that someone as "fluent . . . and well-educated" as Mr. Ssali would have failed to mention in an asylum application his Democratic Party membership or the details of his detentions. *Id.*

Because it believed his testimony was not credible, the BIA concluded that Mr. Ssali did not meet the burden of proof for an asylum claim. In its view, the IJ had been reasonable in requiring corroborating evidence. Because Mr. Ssali had not corroborated "particular facts showing persecution," the BIA concluded that Mr. Ssali had failed to meet his burden of proof in establishing either past persecution or a well-founded fear of future persecution. *Id.*

### E.  Mr. Ssali's Motion to Reopen

Following the BIA's dismissal of his appeal, Mr. Ssali married a United States citizen. Mr. Ssali's wife filed a Form I-30, seeking to classify Mr. Ssali as a family member. Subsequently, Mr. Ssali filed a motion to reopen the proceedings against him. The Government opposed the motion to reopen, and the BIA denied it.

## II

## DISCUSSION

In cases in which the BIA writes an opinion that does not "adopt[] . . . or supplement[]" the opinion of the IJ, *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004), the BIA's opinion "becomes the basis for judicial review of the decision of which the alien is complaining," *Niam v. Ashcroft*, 354 F.3d 652, 655 (7th Cir. 2004). On the other hand, in cases in which the BIA writes an opinion "supplement[ing]" the decision of the IJ, "the IJ's opinion as supplemented by the BIA's opinion becomes the basis for review." *Liu*, 380 F.3d at 311. The Government contends that we should conduct the latter sort of review, and we agree. The BIA's analysis supplemented the IJ's credibility determinations; it also made its own independent assessment of the evidence regarding the current conditions in Uganda with respect to political and human rights. Thus, we review the IJ's opinion as supplemented by the BIA's analysis.

## A. Asylum

We review the BIA's denial of a petition for asylum under the substantial evidence standard. *See Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). "The BIA's decision must be affirmed if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation omitted). We shall grant the petition for review only if the petitioner "shows that 'the evidence not only *supports* [reversal of the BIA's decision], but *compels* it.'" *Liu*, 380 F.3d at 312 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)) (emphasis and alteration in original).

The credibility determinations made by the IJ and the BIA are entitled to "highly deferential review, . . . so long as they are supported by specific, cogent reasons that bear a

legitimate nexus to the finding."[4] *Capric*, 355 F.3d at 1086 (internal quotations and citations omitted).

To qualify for asylum, an applicant must show that he is a "refugee," 8 U.S.C. § 1158(b); that is, that he is a "person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). "Hence, to qualify for . . . asylum, an applicant must establish past persecution or a well-founded fear of future persecution." *Capric*, 355 F.3d at 1084. A showing of past persecution gives rise to a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1).

The IJ evaluates an alien's claim for credibility, assessing internal consistency, plausibility and detail. *Capric*, 355 F.3d at 1085. "If determined to be credible, the testimony of the

---

[4]  Congress recently has altered the standards by which immigration judges reach credibility determinations in asylum and withholding cases. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Division B—REAL ID Act of 2005, Pub. L. No. 109-13, §§ 101(a)(3), (b), 119 Stat. 231 (codified at 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C)). However, these changes apply only to applications for asylum, withholding or other relief from removal that are made on or after May 11, 2005, the effective date of the amendments. REAL ID Act § 101(h)(2). Thus, the portions of the REAL ID Act affecting credibility determinations do not apply to determinations made in the course of Mr. Ssali's 2001 petition. *See Chen v. Gonzales*, ___ F.3d ___, 2005 WL 2036223, at *1 (7th Cir. 2005); *see also Dhima v. Gonzales*, ___ F.3d ___, 2005 WL 1774549, at *5 n.3 (1st Cir. 2005).

alien alone may be sufficient to sustain the burden of proof without corroboration." *Id.* (internal quotations omitted). However, if an IJ finds the alien's testimony to be incredible, the alien must submit corroborating evidence; otherwise, the asylum claim will fail. *Id.* at 1086.

Mr. Ssali submits that the BIA should not have made an adverse credibility finding in his case. Upon review of the administrative record in this case, we must agree. The IJ advanced several reasons for finding that Mr. Ssali's testimony was not credible, and the BIA adopted most of these reasons. The reasons cited by the IJ and expressly adopted by the BIA are the following: (1) Mr. Ssali did not mention his Democratic Party membership in his asylum application, but he testified to it at the hearing; (2) Mr. Ssali stated in his asylum application that his brother was named Ben Jjuko, but he testified at the hearing that he had just one brother named Andrew and that his uncle was named Ben Jjuko; (3) Mr. Ssali stated at the hearing that an unknown man came looking for him at his father's home after Mr. Ssali left Uganda, but Mr. Ssali did not mention this fact in his asylum application; (4) Mr. Ssali mentioned in his asylum application that some of his family members had been detained or tortured by Ugandan soldiers, but he did not testify to these incidents at his hearing.[5] In light of the adverse credibility finding, the IJ and the BIA both also held Mr. Ssali's lack of corroboration of his claims against him.

---

[5] Although the IJ also based its credibility finding on Mr. Ssali's failure to mention at the hearing his membership and on his ability to obtain an exit visa, the BIA concluded that these two grounds were "minor omission[s] tangential to his asylum claim." A.R.80. Therefore, we shall not consider them. *See Niam v. Ashcroft*, 354 F.3d 652, 656 (7th Cir. 2004).

The heart of Mr. Ssali's asylum case is his membership
in the Democratic Party. The IJ and the BIA, however, did
not believe Mr. Ssali's claims of Democratic Party member-
ship because Mr. Ssali did not mention the Democratic Party
in his asylum application. Furthermore, the BIA recognized
that "the Democratic Party . . . has been historically made
up of southerners and Catholics," A.R.81, but also stated in
its opinion that Mr. Ssali "is from eastern Uganda," *id.* We
perceive from the context of the BIA's comments that it was
considering Mr. Ssali's supposed residence in eastern
Uganda as a reason to be skeptical of his claim of member-
ship in the Democratic Party. In truth, Mr. Ssali is not from
eastern Uganda but from southern Uganda, precisely the
place the BIA recognized as the base of the Democratic
Party; in fact, Mr. Ssali expressly testified before the IJ that
he is from Masaka, A.R.170, which is in southern Uganda.

This very significant mistake suggests that the Board
was not aware of the most basic facts of Mr. Ssali's case
and deprives its ruling of a rational basis. It is the sort of
mistake that constitutes the kind of "extraordinary cir-
cumstances" under which a credibility determination
should be overturned. *See Ahmad v. INS*, 163 F.3d 457, 461
(7th Cir. 1999).

By contrast, we think any discrepancy between Mr. Ssali's
application and his testimony at the hearing was not as
significant as either the IJ or the BIA perceived it to be.
Although Mr. Ssali did not mention specifically his member-
ship in the Democratic Party on his asylum application, he
did explain that he was "strongly oppose[d] and criticize[d]
the one party system dictatorship in Uganda, and the
banning of multi-party democracy," and that he feared
being suspected as "a collaborator with ant[i]-government
personnel." A.R.360. Indeed, the BIA recognized that the
Democratic Party was the strongest opposition party in

Uganda during the time period relevant to Mr. Ssali's claims of persecution. Most importantly, Mr. Ssali's asylum application and his hearing testimony made the same point: He alleged that he had been detained and tortured based on his political beliefs.

We turn next to an alleged incident in which an unknown man approached Mr. Ssali's father after Mr. Ssali's departure from Uganda, an incident to which Mr. Ssali did not refer in his asylum application. As the BIA characterized it, such an incident "shows a continuing interest in [Mr. Ssali] by the government which could establish a well-founded fear of persecution whether or not he establishes past persecution." A.R.81. However, the BIA thought that the failure to mention this incident in his asylum application adversely impacted on Mr. Ssali's credibility; it reasoned that it would be "inconceivable . . . that someone so . . . well-educated would . . . omit[] entirely [from his asylum application] . . . any details regarding . . . the visit to his father of the inquiring stranger." A.R.82. The foregoing is not a cogent reason for discrediting Mr. Ssali's testimony. *See Ahmad*, 163 F.3d at 461. There is no inconsistency between Mr. Ssali's asylum application and his testimony suggesting that the government was interested in his whereabouts. Indeed, Mr. Ssali's allegation that an unknown man sought to learn of his whereabouts is entirely *consistent* with his asylum application which claimed that his political opinions made him a target for government oppression. Furthermore, this reason bears no legitimate nexus to the adverse credibility finding; describing events consistent with one's asylum claim *supports* an applicant's credibility, rather than detracting from it.

The IJ and the BIA also perceived a discrepancy between Mr. Ssali's reference, made in his application for

asylum, to his "brother (Ben Jjuko)" who allegedly was tortured, A.R.358, and his reference, made during cross-examination, to an uncle named Ben Jjuko who allegedly was killed in 1998. Both the IJ and the BIA held this inconsistency against Mr. Ssali in making credibility determinations. However, we think that the question of the relationship of Ben Jjuko to Mr. Ssali is merely peripheral to Mr. Ssali's asylum claim. In both his asylum application and his hearing testimony, Mr. Ssali made his politics the central issue. The relationship of Ben Jjuko to Mr. Ssali is incidental to Mr. Ssali's asylum claim. *See Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004) ("[A]dverse credibility determinations should not be grounded in trivial details or easily explained discrepancies . . . .").

The same rationale must govern the Board's insistence that Mr. Ssali's credibility was diminished by his failure to mention, in his hearing testimony, the detention of other family members to which he had alluded in his asylum application. Having determined that the IJ and the BIA's other reasons for discrediting Mr. Ssali's testimony are not probative, we do not believe that an adverse credibility determination can be supported by the relationship of Ben Jjuko to Mr. Ssali and the occurrences related to Mr. Ssali's other family members. *See Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (noting that court was "not inclined to defer to [the IJ's] credibility determination on [one] remaining . . . ground alone" when it had found that all but one of the grounds for the IJ's adverse credibility determinations were not supported by the evidence).

In light of the IJ and the BIA's credibility determination errors, we conclude that the decision to deny Mr. Ssali's asylum application was not based on substantial evidence. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1045 (7th Cir.

2003). Therefore, we remand the case.[6]

### B. Motion to Reopen

Because we have granted the petition for review and reverse and remand Mr. Ssali's asylum petition, we also vacate the judgment of the BIA with respect to the motion to reopen. In doing so, we pause to note that, even if we had denied the asylum petition, we would have been disposed to grant the petition in the motion to reopen.

First, the Board has given us very little explanation for its action, which would have made review of the merits very difficult. Although "the BIA is not required to write an exegesis on every contention," it is required to "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) (internal quotation omitted). The Board's written decision does not indicate its reasoning in a manner that is sufficient to allow review by this court.

Moreover, it appears clear that the Board misread its own precedent in *Matter of Arthur*, 20 I. & N. Dec. 475 (BIA 1992). The BIA noted that the Government opposed the motion to reopen in Mr. Ssali's case, and further noted that "[s]uch opposition, whether well taken or not, is sufficient to defeat the motion to reopen in the absence of an ap-

---

[6] The Government further submits that, because the BIA did not expressly adopt the IJ's finding that Mr. Ssali's alleged detentions rose to the level of persecution, Mr. Ssali is *not* entitled to asylum. However, we need not address this issue because further proceedings are warranted on account of the errors we already have discussed.

proved visa petition." A.R.2. The Board cited *Matter of Velarde*, 23 I. & N. Dec. 253 (BIA 2002), in support of the notion that the Government's opposition was sufficient to defeat a motion to reopen.

In *Velarde*, the BIA wrote that a motion to reopen

> may be granted, in the exercise of discretion, to provide an alien an opportunity to pursue an application for adjustment where the following factors are present: (1) the motion is timely filed; (2) the motion is not numerically barred by the regulation; (3) the motion is not barred by *Matter of Shaar* . . . ; (4) the motion presents clear and convincing evidence indicating a strong likelihood that [Petitioner's] marriage is bona fide; and (5) the Service either does not oppose the motion or bases its opposition solely on *Matter of Arthur*[, 20 I. & N. Dec. 475 (BIA 1992)].

*Id.* at 256.

Before this court, the Government claims that its opposition was not based on *Arthur*, because *Arthur* applies only to marriages entered into prior to the IJ's issuance of a decision. *See* Respondent's Br. at 45 n.14 ("In *Matter of Arthur*, the alien filed a motion to reopen . . . based on his marriage to a United States citizen after the *commencement* of deportation proceedings, but prior to the immigration judge's decision. . . . In the case at hand, Petitioner married a United States citizen after the immigration judge's decision and after the Board's decision on the merits of Petitioner's asylum claim. . . . [B]ecause Petitioner's marriage occurred after the conclusion of proceedings, his case does not fall within *Matter of Arthur*.").

However, that simply is not an accurate characteriza-

tion of *Arthur*. *See Arthur*, 20 I. & N. Dec. at 476 (noting that the IJ's decision finding deportability was issued October 23, 1990, that the alien did not appeal and that the alien "married his wife on January 18, 1991, *subsequent to the immigration judge's decision* in the case" (emphasis added)); *see also Velarde*, 23 I. & N. Dec. at 254 (noting that IJ's decision finding alien deportable was issued October 27, 1997, that alien filed a timely appeal and that alien married U.S. citizen February 23, 1999, and granting motion to reopen based on marriage).

Furthermore, the statutes on which *Velarde* relied apply to *all* marriages which take place in "the period during which administrative or judicial proceedings are pending regarding the alien's right to be admitted or remain in the United States." 8 U.S.C. § 1255(e)(2). Specifically, 8 U.S.C. § 1154(g) states that a marriage entered into during the time period described in 8 U.S.C. § 1255(e)(2) cannot be the basis for granting immediate relative status unless the alien has resided outside the United States for two years following the date of the marriage. However, § 1154(g)'s restriction

> shall not apply with respect to a marriage if the alien establishes by clear and convincing evidence to the satisfaction of the Attorney General that the marriage was entered into in good faith and . . . was not entered into for the purpose of procuring the alien's admission as an immigrant . . . .

*Id.* § 1255(e)(3). *Velarde* simply outlined a five-factor test for the "exercise of discretion" afforded to the Government under the statutes just mentioned. *Velarde*, 23 I. & N. Dec. at 255-56.

The statutes on which *Velarde* relied draw no distinction between marriages entered into while administra-

tive proceedings are pending and those entered into when administrative proceedings have concluded but judicial proceedings are ongoing. In this case, Mr. Ssali had taken a timely appeal from the BIA's denial of his petition for asylum; therefore, judicial proceedings still were pending.

Although the decision to grant a motion to reopen is subject to the BIA's discretion, we are not satisfied in this case that the Board correctly interpreted *Arthur.* The Board did not explain its reasons, and the only reason the Government can suggest to this court appears to rest on a misunderstanding of *Arthur*.

### Conclusion

For the foregoing reasons, we grant the petition for review of Mr. Ssali's asylum case. The BIA's decision is reversed. The case is remanded for proceedings consistent with this opinion.

For the foregoing reasons, the petition for review of the motion to reopen is vacated.

No. 03-3567 REVERSED and REMANDED
No. 04-2148 VACATED

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*