**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued November 1, 2005
Decided November 22, 2005

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-4298

| | |
|---|---|
| XIU XIN ZHENG, | Petition for Review of an Order of |
| *Petitioner*, | the Board of Immigration Appeals |
| v. | No. A71 824 225 |
| ALBERTO R. GONZALES, | |
| *Respondent.* | |

ORDER

Xiu Xin Zheng, a native of China (Fujian Province), petitions for review of an order of the Board of Immigration Appeals.  Zheng sought asylum, withholding of removal, and relief under the Convention Against Torture on the ground that he had been a victim of China's coercive family planning practices and, if returned to China, would face future persecution at the hands of local officials.  The Immigration Judge denied Zheng's request, finding that Zheng was not credible.  The BIA adopted the IJ's reasoning in a separate opinion and added that, even if the IJ had found Zheng credible, he could not demonstrate past persecution or a likelihood of future persecution.  We deny his petition.

Zheng arrived in the United States as an immigrant without a visa and was detained by the Immigration and Naturalization Service. At the detention facility, Zheng prepared and signed an affidavit in which he swore that his sole purpose for coming to the United States was to seek employment and that he was not wanted by the Chinese authorities. He later timely filed a request for asylum and withholding of removal in which he stated he fled China after local authorities forced his wife to abort their child and that he feared monetary penalties as well as possible imprisonment if he returned. Following a hearing on the merits, an Immigration Judge ordered that Zheng be excluded, but while the case was on appeal the INS terminated the proceedings under its then-existing policy that an applicant seeking asylum based upon a family planning issue be allowed additional time to pursue the claim. Zheng was paroled but not admitted. The INS subsequently served Zheng with a Notice to Appear before another IJ. The new charging document terminated Zheng's parole, and his status reverted to that of an arriving alien eligible for asylum, withholding of removal, and relief under CAT.

At the removal hearing that is the subject of this Petition, Zheng testified that he and his wife, Feng Hua Zhao, married when he was 21 and she was 19. At that time, Zhao was pregnant. Although Zheng applied for a marriage certificate, Chinese authorities denied the application because Zheng and Zhao were not of legal age to marry. Zheng knew that the legal age for marriage in China is 22 for men and 20 for women, but the couple nonetheless performed a traditional marriage ceremony at his home with his family in attendance. The marriage, Zheng acknowledges, was never recognized by the state.

Approximately three months later, Zheng says, he received notice from the government that he owed a fine of 20,000 yuan, or about $3,000, because Zhao's pregnancy occurred outside of marriage. He testified that he did not pay the fine because he could not determine whether it was for the illegal pregnancy or for "the baby," nor could he determine whether it was merely the first of many fines yet to come. Instead, he went to the family planning office to contest the fine but did not deny impregnating Zhao before marrying her. The officials refused to waive the fine. Zheng testified that he felt "insulted" and left the office, taking the notice with him.

Zheng then testified that, when Zhao was between five and six months pregnant, five unidentified people broke into his home at night; he assumed they were from the family planning office. The intruders grabbed Zhao, pulling off her clothes, and beat him. He cursed them and fought them off with only his empty hands. He was able to escape, but Zhao was not. The intruders then forcibly took Zhao to the hospital for an abortion. Although Zheng did not go with Zhao, he says he did visit her at her parent's home a couple days later. He then went into hiding because he believed he would be arrested for not paying the fine and for interfering

with Zhao's abduction.  Upon further questioning Zheng conceded that he did not know if Zhao would have been allowed to have the baby if he had he paid the fine.

Zheng remained in China for over two months following his escape.  During that time, Zheng's family borrowed money from relatives and sold some land to raise $30,000 to pay smugglers to transport Zheng by boat to the United States.  Zhao stayed in China with her parents.

Immediately upon his arrival in Los Angeles, an immigration officer interviewed Zheng through an interpreter.  Zheng admits that during the interview he signed an affidavit in which he stated that he was a seasonal farmer and left China because "there are not many jobs for people like us," but he contends that he actually told the interviewer he left to "avoid some trouble."  He said he did not elaborate because the interpreter was Chinese, and he was afraid to tell him the details.  He added that any statement to immigration officials about seeking employment in the United States was made merely to assure the officials that he planned to support himself.  Moreover, he testified that the interpreter was busy with other applicants and did not explain the contents of the affidavit to him.  Zheng nonetheless admits that he never told the immigration officials about Zhao's abortion.

Zheng testified that, if he were returned to China, he would face a fine and possible imprisonment.  He believes that the fine is a certainty because he never paid the 20,000 yuan penalty and, he says, police want him for "interfer[ing] with the public affair[s]."  Although his testimony is unclear as to whether police have formally charged him with a crime, Zheng claims that police contacted his father to request his surrender and told him that "if [Zheng] wait[s] much longer . . . the crime will be worsened or will be more severe."  Zheng, however, could produce no evidence of an outstanding fine, his confrontation with family planning officials, or the authorities' request for his surrender.  Likewise, although Zheng testified that he speaks with Zhao twice a week, he submitted only one letter from her dated more than seven years after his departure that vaguely refers to an abortion and Zheng's living alone in the United States "[f]or freedom and the avoidance of the Chinese government's persecution."  He could produce no other evidence of their marriage or her abortion.

When asked why he was unable to produce documents to support his claims, Zheng testified that no proof of his confrontation with family planning officials existed, nor did evidence of the authorities' request for his surrender, because "their words are the . . . law[] . . . you just do whatever they say.  If you don't . . . they can send you to jail."  He could produce no evidence of his marriage to Zhao because, he says, "in the traditional marriage, we really don't have any kind of documents per se to show."  Likewise, he could produce no evidence of Zhao's abortion because he "did not dare" ask for it.  Although Zheng testified that he did not know corroborating

documentation would be necessary, the IJ at Zheng's initial hearing requested corroborating evidence from him such as affidavits and letters from family members. In addition, Zheng's attorney asked him to obtain a copy of his family registry, but Zheng testified that his father refused to send it because his name had been removed and, as a result, it no longer recorded his marriage to Zhao.

The IJ denied asylum, finding Zheng's testimony not credible and unsupported by corroborating evidence. In particular, the IJ discredited Zheng's explanation for telling immigration officials that he came to the United States to find a job and then later testifying that he came because he was persecuted for resisting Zhao's abortion. The IJ also questioned Zheng's inability to explain why he told immigration officials that he was not wanted by Chinese authorities but then later testified to all the "trouble" he left behind. The IJ found Zheng's sole evidence—Zhao's letter to him—insufficient to corroborate his testimony, given the many years during which he could have accumulated evidence to support his claims of political persecution. The IJ found that Zheng was an economic, not a political, refugee.

The BIA affirmed in a separate opinion. It adopted the IJ's credibility determination, finding that Zheng left China for economic, not political, reasons. The BIA also supplemented the IJ's ruling, finding that even if Zheng's testimony had been credible, he failed to establish eligibility for relief because he was never legally married to Zhao.

When the BIA writes an opinion that adopts the IJ's opinion in part and supplements the IJ's opinion in part, "the IJ's opinion as supplemented by the BIA's opinion becomes the basis for review." *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004). We review both the decision of the IJ and that of the BIA under the highly deferential substantial evidence test and must affirm the decisions so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 312; *see Balogun v. Ashcroft,* 374 F.3d 492, 498 (7th Cir. 2004).

Zheng first challenges the IJ's credibility determination, arguing that the IJ erred when it rejected his testimony solely because he failed to provide corroborating evidence. He contends that his detailed testimony regarding the events surrounding Zhao's abortion and his departure from China is sufficient to support his burden of proof without corroboration. He further contends that the IJ's decision to reject his uncorroborated oral testimony ignores his explanations for the inconsistencies between his testimony and his affidavit.

When assessing an asylum applicant's credibility, the IJ looks for internal consistency and plausibility. *Capric v. Ashcroft,* 355 F.3d 1075, 1085 (7th Cir. 2004). A credible applicant's testimony alone may be sufficient to sustain his claim, *Dawoud*

*v. Gonzales,* 424 F.3d 608, 612 (7th Cir. 2005); *Capric,* 355 F.3d at 1085, but once the IJ finds an inconsistency that could discredit the applicant's testimony, the applicant must convincingly explain the inconsistency or submit corroborating evidence to support his claim, *Ssali v. Gonzales,* 424 F.3d 556, 562 (7th Cir. 2005); *Capric,* 355 F.3d at 1086. An applicant's failure to provide corroborating evidence can be fatal "when the IJ does not believe the applicant or does not know what to believe." *Nigussie v. Ashcroft,* 383 F.3d 531, 537 (7th Cir. 2004). We will uphold the IJ's credibility determinations so long as they are supported by specific, cogent reasons that bear a legitimate nexus to the findings. *Balogun,* 374 F.3d at 498.

When the IJ found inconsistencies between Zheng's affidavit and his testimony, the IJ was entitled to request corroborating evidence. *See Ssali,* 424 F.3d at 562. The IJ here was asked to consider conflicting evidence about Zheng's reasons for coming to the United States—his affidavit stated that he came to find a job, but he testified that he came to escape political persecution. The IJ also was asked to consider whether Zheng was persecuted for resisting Zhao's abortion and was entitled to question the veracity of Zheng's testimony because Zheng did not tell immigration officials about Zhao's abortion upon his arrival in the United States. *See Oforji v. Ashcroft,* 354 F.3d 609, 614 (7th Cir. 2003). Because the IJ did not believe Zheng, it requested evidence to corroborate his testimony.

When Zheng failed to produce extrinsic evidence to corroborate his inconsistent testimony, the IJ was entitled to discredit him. *See Nigussie,* 383 F.3d at 537. Zheng produced only the one letter from Zhao to support his claims that they were married and that she had a forced abortion. He produced no documentation to support his claims that a 20,000 yuan fine had been levied against him, that he had engaged in an altercation with family planning officials, or that he is wanted by authorities. Although Zheng contends that his explanations alone are sufficient to support his claims, the IJ was entitled to reach the equally plausible conclusion that Zheng fabricated his account of political persecution. *See Krouchevski v. Ashcroft,* 344 F.3d 670, 673 (7th Cir. 2003). Because the IJ's decision to reject Zheng's story of political persecution is supported by specific, cogent reasons, we will not disturb the IJ's finding and need not reach Zheng's challenge to the BIA's alternative holding that Zheng did not suffer political persecution because he was not legally married to Zhao at the time of her abortion. *See Capric,* 355 F.3d at 1091-92.

For the foregoing reasons, Zheng's petition is DENIED.