[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 29, 2005
THOMAS  K. KAHN
CLERK

No. 05-12855
Non-Argument Calendar
_____

Agency No. A78-207-329

RU ZHENG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(December 29, 2005)**

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Ru Zheng, a Chinese national, petitions for review of the Board of Immigration Appeals's (BIA) decision affirming without opinion the Immigration Judge's (IJ) order of removal and denial of asylum and withholding of removal claims, as well as her claims under the United Nations Convention Against Torture (CAT). On appeal, Zheng argues that the IJ's adverse credibility findings and denial of her asylum, withholding of removal, and CAT claims were not supported by substantial evidence. For the reasons set forth more fully below, we deny the petition in part and dismiss in part for lack of jurisdiction.

According to a notice to appear issued on September 9, 2002, Zheng entered the United States on or about September 4, 2000, and was charged with removability for remaining in the United States for a longer time than permitted and failing to maintain or comply with the conditions of her non-immigrant status in violation of INA § 237(a)(1)(B), 8 U.S.C. § 237(a)(1)(B) and INA § 237(a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(C)(i), respectively. On November 6, 2002, Zheng signed an application for asylum, withholding of removal, and relief under CAT, alleging persecution on account of her political opinion, and signed it again on October 24, 2003, the date of her hearing.

In a personal affidavit, Zheng explained that she was born in China on April 10, 1981, and while living in China, started a relationship with a man named "Bin

2

Lin." Zheng became pregnant, and Bin Lin was supportive and willing to marry Zheng, but the family planning office learned about the pregnancy and the impending marriage and intervened, telling the two that they were not legally old enough to marry, and telling Zheng in particular that she had to have an abortion, which she did under government pressure. After the operation, the government wanted to insert an intrauterine device (IUD). Later, Zheng was introduced in China to a man named John, with whom she fell in love, and John applied to have Zheng travel to the United States to live with him, which the consulate granted. Zheng subsequently told John about her abortion and previous relationship, and when Zheng arrived in the United States on September 4, 2000, John did not meet her at the airport, was not at his apartment, and, apparently, had already moved away.

Zheng then went to a "service agency" to apply for asylum, but was told that she could not apply because she was not married. She feared returning to China because the government would force her to insert an IUD against her will, and, at the invitation of her cousin, moved to Jacksonville, Florida, where she began to enjoy life in the United States.

Also included with Zheng's application was a birth certificate stating that she was born on April 10, 1981, in Changle City, Fujian Province, to Zheng

3

Minsong, her father, and Lu Meifang, her mother. Zheng also attached a certificate stating that she had undergone an abortion on May 3, 1999, at Changle City Hospital. Zheng's parents submitted a letter on her behalf, and stated that Zheng became pregnant, and she and her boyfriend, Bin Lin, wished to get married, but could not because of an age requirement. Zheng's parents hid her at home, but on May 3, 1999, government officials came to their residence and took Zheng away to Changle Hospital, where her pregnancy was aborted. Afterwards, despite Zheng's poor health, the government insisted that she return to have an IUD inserted.

Later, Zheng was introduced to a new boyfriend, who had returned from the United States, and they had not expected that, upon arrival in the United States, Zheng would be unable to locate her fiancé. Her parents were afraid that Zheng would be harmed and have family planning problems if returned to China. Depending on the format of the date, the letter was signed on either June 8 or August 6, 2003. The record further contained the affidavit of a "retired demographer formerly employed at the United States Bureau of the Census as a specialist on demographic developments and population policy in the People's Republic of China." At the removal hearing, the INS objected to the affidavit, stating that it looked like a prepared and non-specific document, and because the affiant was not present to testify as an expert, the affidavit should be stricken. The

4

IJ permitted the affidavit as a general overview of country conditions in China, but because the affiant was not present, it would only be afforded "the proper weight."

Among the exhibits attached with the affidavit was a copy of what appears to be a translation of a document compiled by the "Changle City Family Planning Policy Leading Team." The document defines early marriage subjects as males who are not yet 22 and females who are not yet 20, and states that early marriage subjects are punished and subjected to the family planning policies. Unmarried females with any history of pregnancy are required to undergo the insertion of an IUD. The affidavit also included 97 different exhibits comprising nearly 300 pages, a review of which revealed that they pertained to a general overview and history of China's implementation of, and penalties for violating, its family planning policies without contributing anything specific to Zheng's claim.

Zheng testified that she was born in Changle City, China, on April 10, 1981, and at the time of her hearing, was not married and had no children. She came to the United States after her fiancé petitioned to get her a K-1 Visa. The two became engaged in Changle City in April 2000, but when Zheng came to the United States to join him, her fiancé did not show up at the airport and, despite her efforts, she was unable to locate him.

Zheng also testified that in March 1999, she discovered she was two months

pregnant by her boyfriend at the time, whom she had met while attending school in Changle City. Under Chinese law, however, Zheng was not of legal age to be pregnant, nor could she get married to her boyfriend because she was under the legal age for that as well. At the advice of her parents and her boyfriend, Zheng hid in her house for fear that she would be forced to undergo an abortion.

On May 3, 1999, family planning officers came to her home and informed Zheng's parents that someone had reported that Zheng was pregnant and unmarried in violation of the law. She was arrested at her home and taken to Changle City Hospital where it was determined that she was four months pregnant. Zheng then received an injection to abort her pregnancy and, after spending four hours in the hospital, delivered a still-born baby. Her parents picked her up later that day, and before being discharged, family planning officials told her that she should return to the hospital when her health improved in order to have an IUD inserted to prevent further pregnancies.

In June and July 1999, officials followed up on their request that Zheng receive an IUD, at which time she told them that her health had not yet recovered. They came again in September, but Zheng had returned to school in Fuzhou City, and Zheng's parents told officials that she would have the IUD inserted after her schooling was finished. Zheng did not know the whereabouts of her boyfriend,

6

who did not wish to speak to her following the abortion. When asked why she did not return to China after arriving in the United States unable to find her fiancé, Zheng testified that she was afraid that officials would force her to insert the IUD. Zheng stated that she could not return to either Changle City or Fuzhou City because she had failed to report to hospitals in either one, and officials would find her.

Next, Zheng testified that, after she failed to find her fiancé, she went to a "service center" seeking to apply for asylum, but was told that she could not apply without being married. She tried again on two other occasions and received the same response.

On cross-examination, Zheng testified that she was 19 years' old when she found out she was pregnant, and 19 at the time she was forced to undergo an abortion on May 3, 1999. Zheng did not have any documentation to prove that she was pregnant because the diagnosis was made at a private hospital, and she testified that she never had the IUD inserted because her health was not well enough for the procedure. Zheng then clarified that she was 19 according to the American, not Chinese calendar.

Also included in the administrative record was the State Department's China Country Report on Human Rights Practices, issued March 31, 2003. Relevant to

7

Zheng's claim, the Marriage Law sets the minimum age for women at 20, and for men at 22 years, and it is illegal in almost all Chinese provinces for a single woman to bear a child. Recently, the Chinese government implemented a new "Population and Family Planning" law, intending to standardize the implementation of the "birth limitation" policies in the local provinces. The new law required counties to use quotas or other measures to limit the total number of births in each county, as well as requiring married couples to apply for permission to have a second child if they meet the stipulated requirements of the local provinces, which sometimes requires as many as four years between pregnancies. China's population control policy relies on education, propaganda, and economic incentives, as well as more coercive measures such as the threat of job loss or demotion, and those who have unapproved children are subject to a "social compensation fee." In at least one province, the rules state that "unplanned pregnancies must be aborted immediately," while in another, women who do not qualify for a "Family Planning Certificate" that allows them to have a child" must use an IUD. However, the central government policy formally prohibits the use of physical coercion to compel persons into abortion, and under the "state compensation law," citizens may sue officials who exceed their authority in implementing birth planning policy.

The record also contained the Department of State's 1998 "Profile of Asylum Claims" for China. It reports that, despite some forced abortions in areas with poorly trained and uneducated family planning workers, there has been success at deterring the number of forced abortions since the early to mid 1980'.s The report also indicated that the Fujian Province has been criticized in the official press for its lax enforcement of family planning rules. Furthermore, the United States Consulate General in Guangzhou was not aware of any forced abortions of illegitimate children or children of couples with an early marriage in the Fujian Province, although it could not exclude the possibility. Relevant to Zheng's claim:

> The U.S. Embassy and Consulates General are unaware of any so-called "abortion certificates," which often are presented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by the law.

Finally, in the Fujian Province, "sterilization or the use of the IUD appears to be urged only for families who have already had two children . . . ."

In closing, Zheng argued that her testimony at the hearing was consistent with her application, and requested that her application for asylum be considered timely because she tried to apply within one year of her entry, but received bad advice about her qualifications from the center, constituting "extraordinary

9

circumstances." In any event, she requested that she be granted withholding of removal.

The IJ, after noting that Zheng previously had conceded to the removal charges, found that her application for asylum was untimely filed, and, therefore, would not be considered. It next considered her claim for withholding of removal, and found that Zheng's testimony, that she was 19 at the time of her pregnancy and abortion, created a conflict with her birth certificate, which indicated that she was 17 at the time she became pregnant and 18 at the time of the abortion. It further found that Zheng had testified that she did not have any certificate to prove her abortion because it was done at a private hospital, which was contradicted by an abortion certificate in the record. The IJ found that the record suffered from credibility problems as a result of these discrepancies, and that the country reports indicated that abortion certificates were obtained only if the abortion was voluntary, not coerced, and that there was no explanation for how she obtained the abortion certificate in the record. "With those credibility problems," the IJ did not believe Zheng had met her high burden of proof for withholding of removal relief. Moreover, the IJ found that Zheng had not proven that she would continue to fear persecution if she returned to Fuzhou City and had failed to demonstrate any evidence that she could not relocate somewhere within China to avoid insertion of

10

an IUD. Finally, the IJ denied Zheng relief under the CAT.

Zheng appealed to the BIA, arguing that the IJ had improperly denied asylum and withholding of removal relief because her testimony was clear, consistent, and credible. She further argued that her application was not time-barred due to extraordinary circumstances. The BIA affirmed, without opinion, making the IJ's decision the final agency determination.

Since the passage of the REAL ID Act of 2005, the permanent rules are applicable to all petitions for review, and, therefore, the permanent rules apply to Zheng's petition as well. See Tovar-Alvarez v. U.S. Att'y Gen., 427 F.3d 1350, 1351 (11th Cir. 2005). When the BIA summarily affirmed the IJ's decision without an opinion, the IJ's decision became the final removal order subject to review. See Mendoza v. United States Attorney Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003) (citing 8 C.F.R. § 3.1(a)(7) (2002)).

## I. Asylum

Zheng argues on appeal that she is eligible for asylum because substantial evidence establishes that she is a refugee within the meaning of the INA. She argues that her forced abortion established past persecution and her actions in violating the family planning policy by getting pregnant under the legal age, as well as her refusal to have an IUD inserted, established a well-founded fear of

11

future persecution if returned to China. Zheng further argues that the "extraordinary circumstances" exception to the one-year deadline for filing asylum applications applies to her because the erroneous advice she received when she originally sought asylum amounts to ineffective assistance of counsel.

We review subject matter jurisdiction de novo. Ortega v. U.S. Att'y Gen., 416 F.3d 1348, 1350 (11th Cir. 2005). As amended by IIRIRA, INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B), provides that an alien may not apply for asylum unless he demonstrates by clear and convincing evidence that the application was filed within one year of his arrival in the United States. A late application for asylum may be considered if the alien demonstrates to the Attorney General's satisfaction the existence of either changed circumstances or extraordinary circumstances relating to the delay in filing the application. See INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D). Pursuant to § 1158(a)(3), however, "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." INA § 208(a)(3), 8 U.S.C. § 1158(a)(3).

In May 2005, Congress passed the REAL ID Act of 2005, which amended the judicial review provisions of INA § 242(a), 8 U.S.C. § 1252(a), to permit review of all constitutional claims and questions of law, notwithstanding any other

12

provision of the statute.[1]  See REAL ID Act, Pub. L. 109-13, 119 Stat 231

§ 106(a)(1)(ii) (May 11, 2005).

Recently, we held that, even in light of the REAL ID Act, we lacked

jurisdiction to review whether a petitioner had filed his asylum application within

one year or established extraordinary circumstances.  See Chacon-Botero v. U.S.

Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005).  Holding that such determinations

were factual and discretionary, we adhered to our "existing precedent that 8 U.S.C.

§ 1158(a)(3) divests our Court of jurisdiction to review a decision regarding

whether an alien complied with the one-year time limit or established extraordinary

circumstances that would excuse his untimely filing."  Id.

Accordingly, as the IJ found that Zheng's claim was time-barred and that the

extraordinary circumstances exception did not apply, we conclude that we lack

jurisdiction to review Zheng's asylum claim.  Therefore, Zheng's asylum claim is

dismissed.  Her withholding of removal claim, however, may be reviewed.

## II.  Withholding of Removal and CAT Relief

Zheng first argues that the IJ's adverse credibility finding, as it related to her

---

[1] The amendment adds § 242(a)(2)(D) to read: "Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section."

age at the time of the pregnancy and the abortion in question and the validity and veracity of the abortion certificate, was not supported by substantial evidence. As for her age, Zheng argues that the record shows that she had a forced abortion at 18, and that any error can be reconciled because Zheng likely confused the American and Chinese calendars and, in any event, whether she was 18 or 19, she was below the legal age for bearing children, giving credence to her claim of a forced abortion. Secondly, as to the abortion certificate, Zheng argues that the IJ misconstrued her testimony, as she was never asked how she obtained an abortion certificate. Next she argues that, while the Country Profile states that abortion certificates are usually issued to patients undergoing voluntary abortion, the Chinese government repeatedly denies the use of force in abortions and, therefore, certificates could be issued solely to make the abortions appear less coerced. Zheng then argues that she was entitled to withholding of removal because the circumstantial evidence of her past persecution and refusal to have an IUD inserted demonstrate that it is more likely than not she will be persecuted if returned to China. Finally, she argues she is entitled to CAT relief because she has already suffered torture by having a forced abortion, fears further harm from the forced insertion of an IUD, and cannot relocate within China to avoid the harm.

To the extent that the IJ's decision was based on a legal determination,

14

review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004) (en banc), cert. denied by Adefemi v. Gonzales, 125 S.Ct. 2245 (May, 16, 2005).

As with other factual findings, "[c]redibility determinations . . . are reviewed under the substantial evidence test." D-Muhumed v. U.S. Attorney General, 388 F.3d 814, 818 (11th Cir. 2004).[2] "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the [IJ] with respect to credibility findings." Id. (citation omitted). Furthermore, "an adverse credibility determination alone may be sufficient to support the denial of an asylum

---

[2] It is noted that the REAL ID Act amended, among other things, the judicial review of credibility determinations. See REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 302 (May 11, 2005). However, those amendments do not apply to applications filed prior to May 11, 2005, the effective date of the amendments. See id. § 101(h); see also Ssali v. Gonzales, 424 F.3d 556, 562 n.4 (7th Cir. 2005).

15

application." Forgue v. U.S. Attorney General, 401 F.3d 1282, 1287 (11th Cir. 2005). On the other hand, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant. That is, the IJ must still consider all evidence introduced by the applicant." Id. (emphasis in original). We require that the IJ "offer specific, cogent reasons for an adverse credibility finding." Id. "A credibility determination, like any fact finding, 'may not be overturned unless the record compels it.'" Id.

Pursuant to INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), the Attorney General:

> [M]ay not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The burden of proof is on the applicant to establish that she would face persecution on account of one of the five covered grounds upon return to the proposed country of removal. See 8 C.F.R. § 208.16(b). If the applicant is determined to have suffered past persecution in the proposed country of removal, a rebuttable presumption arises that her life or freedom would again be threatened upon removal to the proposed country. 8 C.F.R. § 208.16(b)(1)(i).

In order to rebut the presumption, the INS can show, by a preponderance of

16

the evidence, that (1) there has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on any of the five enumerated grounds in the country of removal; or (2) the applicant could avoid a future threat by relocating within the proposed country and that it would be reasonable to expect her to do so. 8 C.F.R. §§ 208.16(b)(1)(i)(A)-(B). If an applicant has failed to prove past persecution, or failed to show that her fear of future persecution is related to her past persecution, then the inquiry shifts to whether an applicant has demonstrated that, if returned to the country of removal, it is "more likely than not" that she will be persecuted on account of one of the five enumerated grounds. 8 C.F.R. §§ 208.16(b)(iii), (b)(2).

The IJ in this case found that Zheng's claims lacked credibility, focusing principally on discrepancies regarding Zheng's age at the time she found out she was pregnant and at the time she was forced to have her abortion. Zheng's birth certificate and testimony were consistent as to her date of birth: she was born on April 10, 1981. However, Zheng's testimony was that she found out she was pregnant in March 1999, at which point she would have been 17 years' old, not 19 as she testified at her hearing. Furthermore, her abortion took place on May 3, 1999, at which point she would have been 18, not 19, as she testified at her hearing. Zheng presents the possibility that she confused the American and

Chinese calendars. However, Zheng specifically testified on direct/redirect that she referred to her age based on the Western/American calendar. Thus, substantial evidence supports the IJ's conclusion that Zheng's testimony as to these important events lack credibility.

As to the abortion certificate, the IJ erred by stating that Zheng failed to get an abortion certificate because she went to a private hospital. What Zheng actually testified was that she did not have a certificate of pregnancy because she found out about her pregnancy at a private hospital. However, when asked if she had any documentation at all, Zheng replied that she did not, although a certificate indicating that she had an abortion would have been evidence of a pregnancy. Notwithstanding the IJ's erroneous statement regarding Zheng's testimony, there was this evidence relevant to the abortion certificate:

> The U.S. Embassy and Consulates General are unaware of any so-called "abortion certificates," which often are presented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by the law.

While her initial brief posits a number of possible reasons the Chinese government might issue an abortion certificate, Zheng failed to cite to any direct evidence in support of those claims. Accordingly, when the IJ found that abortion certificates

18

are not issued by the Chinese government unless they are performed voluntarily, that finding was supported by substantial evidence.

Therefore, the IJ's adverse credibility finding was supported by substantial evidence, and the record does not compel a reversal of the IJ's determination that Zheng failed to establish her eligibility for withholding of removal, or for that matter, past persecution. Furthermore, the IJ found that Zheng had failed to prove that it was more likely than not that she would face persecution if returned to China based on her fear of being required to insert an IUD.

The IJ's finding was supported by substantial evidence. Zheng testified that family planning officials went to her parents' home in Changle City to ensure that Zheng reported for the IUD insertion, but no officials ever came to her school in Fuzhou City. In fact, Zheng specifically testified that she had "no problem" while in school. Furthermore, her boyfriend from the pregnancy and her former fiancé are both out of contact with Zheng, and, while Zheng was under the legal age for pregnancy and marriage at the time of her pregnancy, she is now 24 years' old, above the legal age for both. While Zheng testified that she would be sought out in Fuzhou City for failing to report to family planning officials, she failed to explain why they would pursue her there given that they had not pursued her while she was attending school. Accordingly, the IJ's determination that Zheng failed to meet her

19

burden of proof for withholding of removal does not compel a reversal.

Lastly, to the extent Zheng properly exhausted her administrative appeal of the IJ's denial of CAT relief, because she failed to demonstrate that it was more likely than not that she would be persecuted if returned to China, she likewise is unable to demonstrate that it is "more likely than not" that she will be tortured either.

Accordingly, because we conclude that we lack jurisdiction over Zheng's asylum claim, and that substantial evidence supports the IJ's adverse credibility determination and denial of withholding of removal and CAT relief.  Therefore, we dismiss the petition in part and deny in part.

**PETITION DENIED IN PART, DISMISSED IN PART.**